# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 08-3041

_____

| | | |
|---|---|---|
| Ibrahim Mumid; Fadumo Muse; Fahmo Ahmed; Safiya Mohamad; Iftu Jibril; Maymuna Muktar Osman; Misbah Ibrahim; Amal Mohamed; Shamsa Ali Mohamed; Yarub Siyad; Muna Mohamed; Amina Harun; Mohamed A. Mohamed, | * * * * * * * * | |
| Plaintiffs/Appellants, | * | |
| v. | * * * | Appeal from the United States District Court for the District of Minnesota. |
| Abraham Lincoln High School; The Institute for Americans; Special School District No. 1, | * * * * | |
| Defendants/Appellees, | * * | |
| Special School District No. 1, | * * | |
| Third Party Plaintiff/Appellee, | * * | |
| v. | * * | |
| Metropolitan Federation of Alternative Schools, Inc., | * * * | |
| Third Party Defendant/Appellee. | * | |

_____

Submitted:  October 20, 2009
Filed:  August 25, 2010

_____

Before COLLOTON, BEAM, and BENTON, Circuit Judges.
_____

COLLOTON, Circuit Judge.

Ibrahim Mumid and twelve of his former schoolmates brought suit against the Institute for New Americans and Special School District No. 1 of the Minneapolis Public Schools ("the District"). They alleged violations of the Equal Educational Opportunities Act, Title VI of the Civil Rights Act of 1964, and the Minnesota Human Rights Act. The district court[1] granted summary judgment for the defendants on all counts, and we affirm.

I.

The thirteen plaintiffs are former students at Abraham Lincoln High School ("ALHS"), an alternative high school for immigrant students. During the relevant period, ALHS was operated by the Institute for New Americans ("INA"), a non-profit entity, under contract with the Minneapolis Public Schools ("MPS").[2] ALHS served students aged 14 and older who had arrived recently in the United States. About two-thirds of the student body had reached the age of 18. Almost all ALHS students were

_____

[1]The Honorable Patrick J. Schiltz, United States District Judge for the District of Minnesota.

[2]INA is a member of another nonprofit entity, the Metropolitan Federation of Alternative Schools ("MFAS"), and from 1997 to 2003, the District contracted with INA through MFAS. [Order at 1–3]. After the students sued INA and the District, the District filed a third-party complaint against MFAS seeking recovery if the District were held liable to the students. The district court's grant of summary judgment rendered moot this complaint against MFAS.

refugees. A large majority of ALHS students received English Language Learner ("ELL") services, including the entire student body in 2004-05.

The plaintiffs in this case are typical ALHS students. All thirteen are natives of either Somalia or Ethiopia; all lived for some time in Kenyan refugee camps before coming to the United States; and all arrived in this country between the ages of 14 and 20 with little or no formal education and limited facility with English.

The plaintiffs attended ALHS between 1999 and 2006. Five of these students graduated from ALHS after fulfilling (or being excused from) the State's graduation requirements. Eight never graduated because they were not able to pass the requisite statewide exams (the Minnesota Basic Skills Tests, or "MBSTs"). Although the State discontinues public funding for students who reach age 21, ALHS permitted several of the plaintiffs to remain enrolled beyond that age in an attempt to complete their education.

In early 2005, a group of ALHS students (including some of the appellants) lodged a complaint with the Minnesota Department of Education ("MDE"), alleging that ALHS was not adequately meeting their educational needs. The MDE opened an investigation, and found in June 2005 that the school was failing to provide adequate educational services in several ways. The MDE determined that ALHS had not used a successful method to recognize disabilities, with the result that "[i]t is highly probable that ALHS . . . missed the identification of numerous special education students each of the past three school years." The MDE based this assessment in part on the fact that the state average for special education students within a given school population was 12.5%, while ALHS had identified less than one percent of its student body as eligible for special education services during the years studied. The MDE noted, too, that ALHS students taking the MBSTs had a 17% passage rate, compared to a statewide passage rate of around 40% for English Language Learners, and that ALHS had an unusually high number of students "age out," *i.e.* reach the age of 21

without graduating from high school. "The data indicates that the Students of ALHS are in need of something more than is being provided," concluded the MDE.

The Department also identified the District's "misunderstanding of the law" regarding special education testing. Despite federal and state regulations requiring school districts to implement systems designed to identify students with learning disabilities, and instructing that students with limited English proficiency should not be excluded from testing and services for students with special educational needs, *see* 34 C.F.R. § 300.532(a)(1); Assistance to States for the Education of Children with Disabilities, 64 Fed. Reg. 12635-36 (Mar. 12, 1999); Minn. R. 3525.0750, the District did not evaluate ELL students for special education until they had been in the school system for three years.

Finally, the MDE faulted the District – and ALHS, under its direction – for violating Minnesota law by failing to develop remediation plans for students who had not yet passed one or more of the required MBSTs at least two years before their anticipated graduation dates. *See* Minn. R. 3501.0110. The MDE prescribed a series of corrective actions that the District and ALHS were required to take to rectify these shortcomings. On April 4, 2007, the MDE declared that the District had completed the required course of corrective action.

Meanwhile, in September 2005, the plaintiffs filed a complaint – based in part on the MDE's findings – against the Institute for New Americans, operating as Abraham Lincoln High School, and Special School District No. 1. The complaint as later amended, filed in October 2006, alleged violations of the Equal Educational Opportunities Act ("EEOA"), 20 U.S.C. §§ 1701-1758, Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, and the Minnesota Human Rights Act ("MHRA"), Minn. Stat. § 363A.13. The district court granted summary judgment for the Institute and the District on all counts. *Mumid v. Abraham Lincoln High School*, No. 0:05-CV-2176, 2008 WL 2811214 (D. Minn. July 16, 2008).

## II.

We review a district court's grant of summary judgment *de novo*, viewing the record in the light most favorable to the nonmoving party. *Cooksey v. Boyer*, 289 F.3d 513, 515 (8th Cir. 2002). We will affirm the grant of summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

Title VI of the Civil Rights Act of 1964 provides: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. The MHRA similarly provides, in relevant part: "It is an unfair discriminatory practice to discriminate in any manner in the full utilization of or benefit from any educational institution, or the services rendered thereby to any person because of race, color, creed, religion, [or] national origin . . . ." Minn. Stat. § 363A.13, subd. 1. The MHRA is typically construed in accordance with federal precedent concerning analogous federal statutes, *Rothmeier v. Inv. Advisers, Inc.*, 85 F.3d 1328, 1338 (8th Cir. 1996), and neither party argues that the federal and state standards should differ in this case. We will thus consider the claims together, but refer only to Title VI for the sake of simplicity.

The students allege that ALHS and the District discriminated against them on the basis of their national origin in two distinct but overlapping ways: (1) generally, by providing a substandard curriculum and programming, and (2) more specifically, by failing to offer timely special education testing and services.

To support their first allegation, the students argue that ALHS provided fewer educational and extracurricular opportunities to them than were available to students

at other area high schools. They point to statements made in a self-assessment completed by the Institute for New Americans in April of 2007:

> Since INA is gaining its financial legs, it wants to now focus on the quality of education for its students. These students, many who have grown up in refugee camps, are appreciative of whatever education is offered to help them pursue their American dream. Unlike other schools in MN, the services offered by [ALHS] outside of the classroom are minimal. We need to offer arts & sports as well as more specialized services such as helping recent immigrants better integrate into American society.

The students also note that ALHS did not offer a program for gifted students or vocational instruction. They argue that these curricular shortcomings, occurring in a school serving only foreign-born students, amounted to discrimination on the basis of national origin. In support of the second allegation, they argue that the policy of not testing ELLs for learning disabilities or other special educational needs until students had been in the school system for three years – a policy that the MDE found to be in violation of federal law – constituted unlawful discrimination.

In rejecting the claim based on substandard curriculum and programming at ALHS, the district court observed correctly that Title VI prohibits only intentional discrimination. Proof of disparate impact is not sufficient. *Alexander v. Sandoval*, 532 U.S. 275, 280-81 (2001). The court found no genuine issue of fact regarding discriminatory intent, because there was no strong evidence of animus based on statements of school personnel, and because the students were unable to identify any "comparator" – a person not a member of the same allegedly protected class – who was treated more favorably than the plaintiffs by ALHS. The court rejected the claim against ALHS based on delayed special-education testing for the same reasons.

On the claim of delayed testing against the District, the court thought there was a prima facie case of discrimination, because foreign-born students were denied

special-education testing until they took three years of ELL classes, while native-born students were offered special-education testing as needed. The court gave two reasons for nonetheless rejecting the claim. First, eleven of the thirteen plaintiffs failed to present evidence that they suffered any injury from the policy. Second, with respect to the other two students, the District offered a legitimate non-discriminatory reason for the policy – namely, that it did not believe that it could reliably assess whether a student needed special-education services until the student had been in the country long enough to learn English. The court ruled that the students failed to present sufficient evidence to show that the District's rationale was a pretext for discrimination based on national origin.

On appeal, the students contend that there was no need for evidence of "comparators" to show discriminatory intent. Citing *UAW v. Johnson Controls, Inc.*, 499 U.S. 187 (1991), they assert that because the policy of delaying special education testing for three years affected solely foreign-born students, the policy was discriminatory on its face, and no further evidence of motive was required. This complaint of a "facially" unconstitutional policy was not raised in the district court, and *Johnson Controls* was not cited in the extensive briefing on the motions for summary judgment. We are thus hard pressed to see why the contention is not waived. *See Orr v. Wal-Mart Stores, Inc.*, 297 F.3d 720, 725 (8th Cir. 2002).[3]

In any event, we also believe that the contention is without merit. The students rely heavily on *Johnson Controls*, where the Supreme Court held that a policy affecting only "women who are pregnant or who are capable of bearing children" violated Title VII of the Civil Rights Act. The plaintiffs in that case were not required to prove that Johnson Controls acted with discriminatory intent in fashioning the

---

[3]The students also quarrel with the district court's conclusion that eleven of the thirteen students suffered no injury from the delayed testing. We agree with the district court's conclusion, but even if there were error on that point, the claims fail on the merits for the reasons discussed.

policy, because "the absence of a malevolent motive does not convert a facially discriminatory policy into a neutral policy with a discriminatory effect." *Johnson Controls*, 499 U.S. at 199. The policy itself was sufficient to prove a Title VII violation. *See also Cmty. House, Inc. v. City of Boise*, 490 F.3d 1041, 1049 (9th Cir. 2007) (discrimination against women and families); *Erie County Retirees Ass'n v. County of Erie*, 220 F.3d 193, 212 (3d Cir. 2000) (age discrimination); *Larkin v. Mich. Dep't of Soc. Servs.*, 89 F.3d 285, 290 (6th Cir. 1996) (discrimination against the disabled); *Johnson v. New York*, 49 F.3d 75, 79 (2d Cir. 1995) (age discrimination).

The rationale of *Johnson Controls* and similar cases cited by the students is not controlling here, because no policy of the District or ALHS singled out a protected class on its face. The policy of delayed testing did not apply to all foreign-born students in the school district, but only to students categorized as "English language learners." While Title VI prohibits discrimination on the basis of national origin, language and national origin are not interchangeable. *See Hannoon v. Fawn Eng'g Corp.*, 324 F.3d 1041, 1048 (8th Cir. 2003); *Soberal-Perez v. Heckler*, 717 F.2d 36, 41 (2d Cir. 1983); *Garcia v. Gloor*, 618 F.2d 264, 268 (5th Cir. 1980). A policy that treats students with limited English proficiency differently than other students in the district does not facially discriminate based on national origin.

The students reiterate their contention that the alleged substandard programming at ALHS is also strong evidence of intentional discrimination by ALHS based on national origin. But they again fail to identify a similarly situated comparator whom the school treated more favorably, and deficient programming in and of itself is not evidence of intentional discrimination based on national origin. The district court thus properly granted summary judgment to ALHS and the District on the Title VI and MHRA claims.

III.

Under the requirements of the Equal Educational Opportunities Act, "[n]o State shall deny equal educational opportunity to an individual on account of his or her race, color, sex, or national origin, by . . . the failure by an educational agency to take appropriate action to overcome language barriers that impede equal participation by its students in its instructional programs." 20 U.S.C. § 1703(f). The students claim that the District violated this law by failing to meet its obligation "to take appropriate action to overcome language barriers." They seek actual and punitive damages, as well as injunctive relief requiring the District to close ALHS and forbidding the conduct alleged in the complaint to be unlawful.

The district court determined that the students had presented evidence sufficient to survive summary judgment on the question whether the District took "appropriate action" to overcome the students' language barriers. The district court nonetheless granted summary judgment for the District on the students' EEOA claim. The court held that the plaintiffs lacked standing because no remedy was available under the statute to redress their alleged injury. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 106 n.7, 129 & n.20 (1983). The court reasoned that because no plaintiff will ever again attend ALHS, injunctive relief could not redress the plaintiffs' injuries, and that monetary damages are not available under the EEOA.

We will assume for the sake of argument that there is sufficient evidence for a reasonable jury to find that the District failed to take appropriate action to overcome language barriers that impeded equal participation by the plaintiffs in the District's instructional programs. We will further assume that this evidence of failure to take appropriate action could support a finding that the District denied equal educational opportunity "on account of . . . national origin." 20 U.S.C. § 1703. We affirm the district court's dismissal of the EEOA claim, because we agree that neither injunctive relief nor monetary damages are available to these plaintiffs.

A.

Congress passed the EEOA in 1974, as a floor amendment to legislation amending the Elementary and Secondary Education Act of 1965. *See Castaneda v. Pickard*, 648 F.2d 989, 1001 (5th Cir. Unit A June 1981). President Nixon first proposed the Act in 1972, declaring that its purpose would be "to clear up the confusion which contradictory court orders [in the wake of *Brown v. Board of Education*, 347 U.S. 483 (1954)] have created, and to establish reasonable national standards" for continuing the process of school desegregation. Special Message to the Congress on Equal Educational Opportunities and School Busing, 1972 Pub. Papers 430 (Mar. 17, 1972). Representative Marvin Esch, introducing the same legislation in March 1974, explained that the purpose of the proposed amendment was to reduce cross-district busing and emphasize the assignment of students to schools close to their homes. 120 Cong. Rec. 8264-65 (1974) (statement of Rep. Esch). In addition to "reemphasiz[ing] education in neighborhood schools," he thought the amendment would "define . . . both denials of equal educational opportunities and remedies available to overcome such denials." *Id.* at 8265.

The EEOA describes six ways in which a State must not deny equal educational opportunity on account of race, color, or national origin. 20 U.S.C. § 1703. The first five proscriptions clearly are aimed at eradicating the lingering effects of segregation in the public school system. *Id.* § 1703(a)-(e). The sixth prohibited practice, "the failure . . . to take appropriate action to overcome language barriers," § 1703(f), is at issue here.

A person who is denied an equal educational opportunity may bring a civil action in federal court "against such parties, and for such relief, as may be appropriate." *Id.* § 1706. The statute gives direction on formulating an appropriate remedy, ordering that "a court, department, or agency . . . shall seek or impose only such remedies as are essential to correct particular denials of equal educational

opportunity or equal protection of the laws." *Id.* § 1712. A section titled "Priority of remedies" then specifies:

> In formulating a remedy for a denial of equal educational opportunity or a denial of the equal protection of the laws, which may involve directly or indirectly the transportation of students, a court, department, or agency of the United States shall consider and make specific findings on the efficacy in correcting such denial of the following remedies and shall require implementation of the first of the remedies set out below, or of the first combination thereof which would remedy such denial:
>
> (a) assigning students to the schools closest to their places of residence which provide the appropriate grade level and type of education for such students, taking into account school capacities and natural physical barriers;
>
> (b) assigning students to the schools closest to their places of residence which provide the appropriate grade level and type of education for such students, taking into account only school capacities;
>
> (c) permitting students to transfer from a school in which a majority of the students are of their race, color, or national origin to a school in which a minority of the students are of their race, color, or national origin;
>
> (d) the creation or revision of attendance zones or grade structures without requiring transportation beyond that described in section 1714 of this title;
>
> (e) the construction of new schools or the closing of inferior schools;
>
> (f) the construction or establishment of magnet schools; or

(g) the development and implementation of any other plan which is educationally sound and administratively feasible, subject to the provisions of sections 1714 and 1715 of this title.

*Id.* § 1713. Several subsequent provisions are likewise concerned with equitable relief. *Id.* §§ 1714-18.

## B.

In their complaint, the students requested an injunction that would either require the District to close ALHS or allow ALHS to remain open but forbid it to engage in any practices deemed unlawful. The students lack standing to seek this injunctive relief. None of the plaintiffs currently attends ALHS and none will ever return, because all have graduated high school or aged out of the public school system. An order that the school must close or conform to certain legal requirements will not redress the injuries alleged by these students. *See Lyons*, 461 U.S. at 106 n.7. The standing problem is compounded by the fact that the entity formerly known as Abraham Lincoln High School now operates as an independent charter school under the name Lincoln International High School ("LIHS"). LIHS and the Minneapolis Public Schools have no contractual relationship, and the District retains no authority over LIHS. Because the District cannot bind the school, a court order directed at the District could not redress the alleged injuries of the students. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 568 (1992).

## C.

The students also sought monetary damages against the District for a violation of their right to equal educational opportunity. The statute by its terms does not authorize monetary damages, but the students point to the broad language of § 1706, which authorizes a civil action "for such relief[] as may be appropriate." They couple this statutory text with the Supreme Court's direction to "presume the availability of

all appropriate remedies unless Congress has expressly indicated otherwise." *Franklin v. Gwinnett County Pub. Schs.*, 503 U.S. 60, 66 (1992). *Franklin* recounted that "[t]his principle has deep roots in our jurisprudence," *id*., and relied on it to hold that damages were available in a suit brought pursuant to the implied right of action under Title IX of the Education Amendments of 1972.

The Court's explication in *Franklin*, however, revealed limitations on the traditional presumption. All appropriate relief is available "*when Congress has given no indication of its purpose* with respect to remedies." *Id*. at 68 (emphasis added). A federal court may order any appropriate relief when a right of action exists to enforce a federal right, and "*Congress is silent* on the question of remedies." *Id.* at 69 (emphasis added). It is well established that a precisely drawn statute usually preempts more general remedies, *Hinck v. United States*, 550 U.S. 501, 506 (2007), and a provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme. *See United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988).

Congress was not silent about remedies in the EEOA. Indeed, the opening section declares that the very purpose of the subchapter is "*to specify appropriate remedies* for the orderly removal of the vestiges of the dual school system." 20 U.S.C. § 1701 (emphasis added). The language and structure of the EEOA indicate that the congressional purpose was to provide only equitable remedies for a violation of the statutory rights created by the statute.

Section 1712 provides that a court shall impose "only such remedies as are essential *to correct* particular denials of equal educational opportunity or equal protection of the laws." 20 U.S.C. § 1712 (emphasis added). "Correct" means "to make or set right," or "to alter or adjust so as to bring to some standard or required condition." *Webster's Third New International Dictionary* 511 (1971). As the district court observed, the verb "correct" is not a natural way to refer to monetary damages, which *compensate* a person for past wrongs without changing the underlying fault or

failing that caused the harm. The inference that Congress was focused on relief other than damages is strengthened by § 1713, which directs a court to consider the efficacy of several *equitable* remedies "in correcting" a denial of equal educational opportunity. 20 U.S.C. § 1713.

Section 1713 also sets forth a "priority of remedies" that a court must consider "[i]n formulating a remedy for a denial of equal educational opportunity." All seven of these remedies are equitable; monetary damages are never mentioned. The statute thus clearly departs from the "ordinary convention" described in *Franklin* that "a court should determine the adequacy of a remedy in law *before* resorting to equitable relief." 503 U.S. at 75-76 (emphasis added). This structure further undermines the suggestion that the "traditional presumption" applied in *Franklin* should be used to infer the availability of monetary damages under the EEOA.

We think the better reading of § 1713 is that it applies to all denials of equal educational opportunity under the EEOA, including a failure to take appropriate action to overcome language barriers under § 1703(f). Section 1713 does refer to remedies involving "directly or indirectly the transportation of students," but – according to usage of the era – the reference comes in a non-restrictive clause set off by commas: "In formulating a remedy . . . , *which may involve* directly or indirectly the transportation of students, a court . . . shall consider . . . the following remedies . . . ." 20 U.S.C. § 1713 (emphasis added). *See* William Strunk Jr. & E. B. White, *The Elements of Style* 1, 3 (2d ed. 1972) (describing an "elementary rule[] of usage" that a "nonrestrictive clause is one that does not serve to identify or define the antecedent noun," and that "[n]onrestrictive relative clauses are parenthetic," such that "[c]ommas are therefore needed"); *id.* at 53 ("*That* is the defining, or restrictive, pronoun, *which* the nondefining, or nonrestrictive."); *The Chicago Manual of Style*, ¶ 5.27 (12th ed. 1969) (instructing that "[i]f a dependent clause following a main clause is restrictive . . . it should not be set off by a comma. If it is non-restrictive, it should be set off by a comma."). The reference to transportation of students, therefore, does not limit the application of § 1713 to cases that involve that particular remedy. *See United States*

*v. Indoor Cultivation Equip.*, 55 F.3d 1311, 1315 (7th Cir. 1995) ("Congress's use of the pronoun 'which' is significant; it introduces a nonrestrictive clause – '*which* are used to ... facilitate [drug transactions ]' – that does not limit the meaning of the word it modifies – 'conveyance.'"); *cf. In re Connors*, 497 F.3d 314, 319 (3d Cir. 2007) ("The word 'that' is a relative pronoun that restricts and, therefore, modifies, the preceding noun, 'foreclosure sale.' Thus, when the statute refers to 'a foreclosure sale *that* is conducted in accordance with applicable nonbankruptcy law,' it clearly refers to a foreclosure sale that complies with state-law procedures.") (emphasis added). Beyond the listing of priorities in § 1713, moreover, each of the remaining sections, §§ 1714-1718, also focuses exclusively on equitable remedies and make no mention of damages.

For these reasons, the language and structure of the EEOA firmly indicate that Congress authorized only equitable remedies for violations of the statute. The district court correctly held that monetary damages are unavailable under the EEOA.

\*          \*          \*

The judgment of the district court is affirmed.

_____