# United States Court of Appeals
## For the Eighth Circuit

_____

No. 14-3841

_____

Idil Abdull,

*Plaintiff - Appellant*,

v.

Lovaas Institute for Early Intervention Midwest,

*Defendant - Appellee.*

_____

Appeal from United States District Court
for the District of Minnesota - Minneapolis

_____

Submitted: October 19, 2015
Filed: April 6, 2016

_____

Before LOKEN, MURPHY, and COLLOTON, Circuit Judges.

_____

COLLOTON, Circuit Judge.

Idil Abdull brought this action against the Lovaas Institute for Early Intervention Midwest and several of its employees, alleging unlawful discrimination based on race and national origin under federal and Minnesota law. The district

court[1] granted summary judgment in favor of the Institute and the employees on all claims. We agree that there is no genuine issue of material fact for trial, and we therefore affirm.

## I.

### A.

The Institute provides Intensive Early Intervention Behavior Therapy to young children with Autism Spectrum Disorder. The Institute designs an individualized treatment plan for each child, and a clinical supervisor leads a team of behavior therapists that administers approximately forty hours of therapy and parent-training sessions in the child's home each week. From 2009 to 2011, the Institute treated forty-five to fifty children, two or three of whom were African American. Subject to staff availability, the Institute will admit any child, but it specializes in work with young children. The Institute treats children for six-month periods; at the end of each period, the Institute decides whether to provide another six months of treatment.

Before deciding whether to accept a child into its program, and at six-month intervals thereafter, the Institute requires parents to read and sign an informed-consent form. The form notifies parents that treatment hours will vary during the six-month treatment period and that staff members will change regularly. Parents may request replacement staff, but they are advised that a replacement is not guaranteed. After the parents sign the form and the Institute decides to provide treatment, the Institute submits a recommendation for treatment to the Minnesota Department of Human Services. If the Department determines that treatment is medically necessary, it will approve the recommendation and agree to fund the child's treatment with the

---

[1]The Honorable Ann D. Montgomery, United States District Judge for the District of Minnesota.

Institute for the six-month period. Otherwise, the family must find an alternative source of funding for the treatment.

The informed-consent form also explains the process for progress reviews. At the end of each six-month treatment period, the Institute reviews the child's progress and determines whether further treatment would be beneficial. If the Institute and the child's family believe that treatment should continue, the Institute submits another recommendation for treatment to the Department. The Institute, however, reserves the right to discharge a child at the end of a six-month period.

From 2009 to 2011, the Institute discharged approximately twelve children from its program each year. The primary factor that guides the Institute's decision to discharge a child is the child's progress. The Institute may discharge a child for other reasons, including uncooperative parents or insufficient staff. If a child has failed to make adequate progress for two consecutive six-month treatment periods, then the Institute may recommend a transitional-treatment plan designed to assist the child's integration into alternative-treatment services.

B.

Idil Abdull is Somali American. In May 2007, her son, whom we will identify by his initials as "AA," was diagnosed with a nonverbal Autism Spectrum Disorder. The Institute treated AA from May 2008 through February 2010. When the Institute accepted AA into its program, AA was almost six years old and only the second child of Somali descent ever admitted.

During AA's first six-month progress review in December 2008, Dr. Eric Larsson, the Institute's executive director of clinical services, and Karin Morris, AA's clinical supervisor, discussed AA's progress and their recommendation with Abdull. Given AA's limited progress, they believed that the best course of action was for the

Institute to provide another six months of treatment, and then, if AA's progress remained the same or regressed, for the Institute to provide six months of transitional treatment. Abdull disagreed with their assessment and thought the Institute was ignoring its policies by giving up on AA after only six months of treatment. Dr. Larsson and Morris explained that the Institute would continue to provide treatment to AA for another six-month period.

In February 2009, Abdull requested a new clinical supervisor and senior behavior therapist for AA. Dr. Larsson informed Abdull that the Institute did not have an available staff member to assume the clinical supervisor position and that the Institute would have to discharge AA if Abdull insisted on obtaining a new supervisor. Abdull then contacted Scott Wright, the Institute's owner, and asked that the Institute continue treating AA. Although Wright did not participate in the day-to-day operations of the Institute, Wright allegedly stated that AA was too old for the therapy program and that children AA's age typically went to school. Soon after Abdull asked for staff changes, one of the Institute's clinical directors volunteered to act as AA's clinical supervisor. The Institute thus decided to retain AA in the program and assigned Courtney Whitcraft to replace AA's senior behavior therapist. Abdull later requested that Whitcraft be replaced, and the Institute granted the request.

During the spring of 2009, Abdull contacted state agencies concerning the Institute's treatment of her and AA. She ultimately filed several complaints, alleging that the Institute was discriminating against her and AA based on their race and national origin. Each agency determined that no action against the Institute was necessary or that no probable cause existed to support a finding that the Institute had discriminated against Abdull and AA.

By AA's second six-month review in June 2009, his progress had not improved. The Institute still did not discharge AA but approved another six months

of treatment to focus on transitional objectives. At AA's third six-month review, in December 2009, AA's progress remained stagnant. The Institute informed Abdull that it would approve another six months of treatment for AA, but this period would be the last. The Institute also told Abdull that she could transfer AA out of the program before completion of the last six-month period if she preferred. In February 2010, Abdull removed AA from the Institute's therapy program.

In August 2013, after exhausting administrative remedies in Minnesota, Abdull sued the Institute and several of its employees, alleging that the Institute had discriminated against her and AA in violation of federal and state civil rights laws, and that the employees had aided and abetted a violation of state law. The district court granted the Institute's motion for summary judgment, reasoning that Abdull had failed to establish a submissible case that the Institute discriminated against her or AA on account of their race or national origin. We review the district court's grant of summary judgment *de novo*, viewing the evidence and drawing all reasonable inferences from that evidence in the light most favorable to the nonmoving party. *Hervey v. Cty. of Koochiching*, 527 F.3d 711, 719 (8th Cir. 2008).

II.

Federal law forbids discrimination "on the ground of race . . . or national origin" in any program or activity, including the Institute's, that receives federal financial assistance. 42 U.S.C. § 2000d. The Minnesota Human Rights Act (MHRA) also prohibits denying any person "full and equal enjoyment" of services of a place of public accommodation "because of race . . . [or] national origin." Minn. Stat. Ann. § 363A.11, subd. 1(a)(1). Abdull brought claims under both statutes and sought damages. Abdull also alleged a violation of 42 U.S.C. § 2000a, which prohibits discrimination in places of public accommodation, but that statute authorizes only prospective relief, not money damages. *Newman v. Piggie Park Enters., Inc.*, 390

U.S. 400, 402 (1968) (per curiam).  Because Adbull sought only damages, the district court properly dismissed her claim under § 2000a.

The district court applied the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to the claims under § 2000d and the MHRA.  Because the district court fully developed the record on the motion for summary judgment, we need consider on appeal only whether there is a genuine issue of material fact for trial on the ultimate question of discrimination *vel non*.  *See U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 714-15 (1983); *Riser v. Target Corp.*, 458 F.3d 817, 820-21 (8th Cir. 2006); *Johnson v. Ready Mixed Concrete Co.*, 424 F.3d 806, 810 (8th Cir. 2005).  We will assume for the sake of analysis that the Institute is a place of public accommodation for purposes of the Minnesota statute.

The federal statute, § 2000d, forbids discrimination "on the ground of" race or national origin.  The phrase "on the ground of" is synonymous with "because of," *see Webster's New World Dictionary of the American Language* 640 (College ed. 1968), and the statute thus requires a plaintiff to show that a forbidden reason was the but-for cause of a denial of benefits.  *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2528, 2533 (2013); *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 180 (2009).  In cases arising under Chapter 363 of the MHRA, however, the Minnesota Supreme Court has ruled that a plaintiff must demonstrate that a prohibited reason "more likely than not motivated" the defendant in taking an adverse action.  *See Anderson v. Hunter, Keith, Marshall & Co.*, 417 N.W.2d 619, 627 (Minn. 1988); *see also LaPoint v. Family Orthodontics, P.A.*, 872 N.W.2d 889, 892-93 (Minn. Ct. App. 2015).  Under this approach, a plaintiff can prevail "even if a[] [defendant] has a legitimate reason" for the disparate treatment.  *LaPoint*, 872 N.W.2d at 892-93 (quoting *McGrath v. TCF Bank Sav., fsb*, 509 N.W.2d 365, 366 (Minn. 1993)).  Although the parties cite no case addressing § 363A.11, subd. 1, we think it likely that the Minnesota court would take the same approach with this provision that the court applies in other sections of the MHRA with comparable text.

As the standards under the state and federal statutes appear to differ, we consider first whether Abdull has established a genuine issue for trial under the more generous Minnesota standard. Because we conclude that her MHRA claim fails under that standard, it follows that the federal claim under § 2000d was properly dismissed as well.

Abdull argues first that her claims are supported by the fact that she and AA were similarly situated to Caucasian parents and children who were treated more favorably in the Institute's program. Abdull posits that three Caucasian, nonverbal autistic children were similarly situated to AA. But the main factor underlying the Institute's treatment decisions is the individual child's progress, and Abdull's evidence does not address the rate of progress for the three comparators. Without evidence showing that the Caucasian children were similarly situated to AA in all material respects, Abdull cannot rely on comparisons in treatment to establish unlawful discrimination. *See Bennett v. Nucor Corp.*, 656 F.3d 802, 819 (8th Cir. 2011).

Aside from the comparators, Abdull contends that other evidence shows that race or national origin motivated the Institute to deny her benefits of its program. She complains that the Institute (1) replaced AA's staff members more frequently than it did for other children, (2) provided fewer treatment hours for AA than for other children, (3) used different treatment programming, technology, or methods with AA than for other children, (4) violated its own policies when it recommended discharging AA after his first six months in its therapy program, and (5) refused to consider the recommendation of AA's independent psychologist. We agree with the district court that there is insufficient evidence to show that any unfavorable treatment was motivated by race or national origin.

Although AA endured several staff changes, the evidence does not support a finding of discriminatory motive. From May to October 2008, three employees

served as AA's clinical supervisor. The first left the Institute for another job, and the second was assigned only as a temporary replacement. Three more staff changes occurred after October 2008 as a result of Abdull's requests. Abdull protests that the second supervisor falsely said that she was reassigned because she did not work with children as old as AA, but Abdull does not dispute that this supervisor was designated as temporary from the outset, and she offers no admissible evidence that the Institute reassigned the supervisor to work with older children.

AA's treatment hours do not support Abdull's claim. During AA's time with the Institute, he received an average of forty-eight hours of treatment per week. From June to December 2009, AA's last six-month treatment period with the Institute, AA averaged forty-six hours of treatment per week. These amounts were well within the range of treatment hours that other children received at the Institute. Some of the fluctuations about which Abdull complains, moreover, were caused by Abdull's decision to prohibit trainees from working with AA or by conflicts with AA's schooling schedule. Abdull presents no evidence to support a finding that race or national origin was a motivating factor behind the Institute's decisions about AA's treatment time.

Abdull's complaints that the Institute used different treatment programming, technology, or methods with AA do not support a finding of discriminatory motive. While the Institute did not train AA to use eating utensils, the Institute was responding to Abdull's request to use a different approach for cultural reasons. The Institute varied the lessons and the amount of time it devoted to teaching each lesson based on AA's individual needs. Abdull asserts that the Institute withheld technology from AA's treatment, but she fails to demonstrate that the Institute used either Apple iPad technology or video recordings of therapy sessions during AA's time in the program. There is no evidence that the Institute declined to employ the technology with AA for reasons of race or national origin.

The evidence does not support a finding that the Institute's handling of Abdull's recommended discharge was a denial of benefits motivated by race or national origin. The Institute followed its policies and did not recommend AA's discharge until February 2009 when it was unable to accommodate Abdull's demand for another new clinical supervisor. Even then, the Institute eventually located another clinical supervisor, and AA remained in the program. The alleged statement of the Institute's owner concerning AA's age is therefore immaterial, because the February 2009 recommendation did not deny AA the full and equal enjoyment of services and benefits under the program.

The record belies Abdull's claim that the Institute ignored the recommendation of AA's independent psychologist when it decided to recommend his discharge. In May 2009, the Institute received a letter authored by AA's independent psychologist recommending continued treatment for AA. The February 2009 discharge recommendation therefore pre-dated the psychologist's input, and the Institute's actions after May 2009 conformed to the psychologist's recommendation. The Institute twice elected to provide another six months of treatment for AA after May 2009, and it continued to treat AA until Abdull withdrew him in February 2010.

Abdull also argues that the Institute treated her less favorably than it did other parents. The Institute did adopt special procedures for Abdull involving an individualized communication plan and an absentee system for missed treatment sessions. But these procedures were triggered by Abdull's absences and disruptions of therapy sessions, as evidenced by her failure to meet the Institute's benchmark for maintaining professional boundaries with Institute employees. Abdull's evidence concerning her performance at parent-training sessions does not contradict the Institute's rationale for imposing these procedures. The Institute, moreover, responded in a similar fashion when fourteen other families, a majority of whom were of European descent, frequently disrupted or missed therapy sessions.

For these reasons, the district court properly granted summary judgment in favor of the Institute on Abdull's civil rights claims.  Because the Institute did not violate the MHRA, the district court also correctly dismissed Abdull's tag-along claims that Institute employees aided and abetted a violation of the MHRA.  *See* Minn. Stat. Ann. § 363A.14; *McDonald v. City of Saint Paul*, 679 F.3d 698, 708 (8th Cir. 2012).

*      *      *

The judgment of the district court is affirmed.  Abdull's motion to strike affidavits is dismissed as moot, because the disputed evidence is unnecessary to a decision.  *See Stewart v. Prof'l Comput. Ctrs., Inc.*, 148 F.3d 937, 940 n.3 (8th Cir. 1998).

_____