# United States Court of Appeals
## For the Eighth Circuit

———————————————

No. 22-2831

———————————————

Maria Murguia

*Plaintiff - Appellant*

v.

Charisse Childers, Director,
Division of Workforce Services, in her official capacity

*Defendant - Appellee*

————————

Appeal from United States District Court
for the Western District of Arkansas

————————

Submitted: June 14, 2023
Filed: August 24, 2023

————————

Before GRUENDER, KELLY, and GRASZ, Circuit Judges.

————————

GRASZ, Circuit Judge.

María Murguía sued the Director of the Arkansas Division of Workforce Services ("DWS") in her official capacity, alleging discrimination on the ground of

national origin under Title VI of the Civil Rights Act. The district court[1] entered summary judgment in favor of the Director. We affirm.

## I. Background

Murguía is an immigrant from Mexico who lives in Arkansas and speaks only Spanish. After Murguía lost her job because of COVID-19, she applied for unemployment insurance at a DWS office in April 2020. During her visit, Murguía's daughter Alejandra—who speaks English and Spanish—helped her fill out and submit a paper application for unemployment insurance. Murguía and Alejandra were not offered an interpreter.

After Murguía submitted her paper application, a DWS employee converted the application to an electronic one. That electronic application erroneously listed Murguía's last employer as Molly Maid. In fact, Murguía had quit her job at Molly Maid in November 2019 and began working for Holiday Inn thereafter. In part because Holiday Inn incorrectly recorded Murguía's social security number, the district court noted it is "unlikely" the error in the electronic application was Murguía's fault.

Murguía tried to correct the misunderstanding about her last employer, but her initial attempts were unsuccessful. In June 2020, for example, DWS issued a Notice of Agency Determination in which it disqualified Murguía from benefits based on the understanding that she quit her job with Molly Maid in November 2019.[2]

Murguía's second visit to a DWS office was in late August 2020. Murguía and Alejandra spoke with DWS employee Raymond Michaud, explaining Murguía's

---

[1]The Honorable Timothy L. Brooks, United States District Judge for the Western District of Arkansas.

[2]As with other documents DWS sent to Murguía, the Notice of Agency Determination was in English.

last employer was Holiday Inn—not Molly Maid. According to Murguía, Michaud had "a mad, mean look" and asked for supporting paystubs from Holiday Inn. The next day, Murguía and Alejandra returned with the requested paystubs and again interacted with Michaud. Michaud stated he no longer needed the paystubs and explained that Murguía needed to work somewhere for thirty days before she could be eligible for benefits. Alejandra was under the impression that Michaud was "annoyed" and "irritated" during the encounter. Michaud did not offer an interpreter.

Interactions between Murguía and DWS continued, albeit not in person. At times, Murguía communicated with Corina Parra, a DWS employee that helps claimants who possess limited English proficiency. Indeed, Parra helped Murguía translate and often returned Murguía's phone calls within a day. Alejandra also emailed Parra the requested Holiday Inn paystubs.

In September 2020, DWS issued an amended Notice of Agency Determination in which it acknowledged its prior determination "was issued in error since [Molly Maid] was not [Murguía's] correct last work." Murguía later began receiving unemployment benefits, but her bureaucratic woes continued.

In April 2021, DWS sent Murguía notice that she had failed to properly report her earnings. To avoid a "fraud determination," DWS asked Murguía to provide an explanation for the discrepancies. Later that same month, Murguía and Alejandra visited DWS to provide a copy of her identification and residency card. Murguía asked for an interpreter, so DWS began looking for one. Murguía waited for less than twenty minutes before signing a document entitled "Waiver of Interpreter Services" and leaving so that she would not be late to work. Notably, this April 2021 visit was the only time Murguía requested DWS provide an interpreter.

Murguía was unable to satisfy DWS's request for supporting documentation, as evidenced by an August 2021 Notice of Agency Determination that Murguía did not correctly report her earnings. Murguía appealed the adverse agency

determination. At a corresponding telephonic hearing in January 2022, an interpreter was available for part, but not all, of the proceeding. Nonetheless, in February 2022, the Arkansas Appeal Tribunal reversed the agency determination. While acknowledging Murguía incorrectly reported earnings between December 2020 and March 2021, the Appeals Tribunal concluded the error was not willful because she "testified that she did not realize she was required to report her part time earnings, due to her inability to speak English."

Based on these experiences and DWS's failure to provide interpretation and translation services, Murguía filed this lawsuit against the Director of DWS in her official capacity. She asserts she was discriminated against on the ground of national origin in violation of Title VI. *See* 42 U.S.C. § 2000d. Following discovery, the district court entered summary judgment in favor of the Director after concluding there was no genuine dispute of material fact and Murguía's claim failed as a matter of law. While the district court empathized with Murguía's plight, it considered the pandemic's effects on her bureaucratic obstacles and ultimately concluded she did "not produce sufficient evidence to support an inference of intentional discrimination as a matter of law." Murguía timely appealed.

## II. Analysis

### A. National Origin Discrimination

Murguía argues the district court erred by concluding there is no genuine dispute of material fact on her Title VI claim. We review de novo a district court's grant of summary judgment, viewing the facts in a light most favorable to the nonmovant. *Mumid v. Abraham Lincoln High Sch.*, 618 F.3d 789, 793 (8th Cir. 2010). A district "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is

no genuine issue for trial." *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The parties agree with the district court that the analytical framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies.[3] *McDonnell Douglas* established a burden-shifting framework in which the plaintiff "must carry the initial burden under the statute of establishing a prima facie case of . . . discrimination." 411 U.S. at 802. If the plaintiff establishes a prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the [action]." *Id.* If the defendant articulates such a reason, the burden then shifts back to the plaintiff to show the defendant's "stated reason for [the action] was in fact pretext." *Id.* at 804.

Title VI includes an implied private right of action to enforce the statute's prohibition against intentional discrimination. *Alexander v. Sandoval*, 532 U.S. 275, 279–80 (2001). Under Title VI, "No person in the United States shall, on the ground of . . . national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. The terms of the provision have been clarified by precedent. "To 'discriminate' against a person meant in 1964 what it means today: to 'trea[t] that individual worse than others who are similarly situated.'" *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 143 S. Ct. 2141, 2208 (2023) (Gorsuch, J., concurring) (quoting *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1740 (2020)). "On the ground of" means but-for

---

[3]Murguía implicitly concedes there is no direct evidence of discrimination. *See Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985) (explaining *McDonnell Douglas* "is inapplicable where the plaintiff presents direct evidence of discrimination").

causation. *Abdull v. Lovaas Inst. for Early Intervention Midwest*, 819 F.3d 430, 433 (8th Cir. 2016).[4]

Murguía does not present a prima facie case of intentional discrimination. Murguía's prima facie case largely hinges on her position that this court must provide *Chevron*[5] and *Auer*[6] deference to regulations and agency guidance issued under Title VI and the Workforce Innovation and Opportunity Act. In her view, these regulations and agency guidance define "national origin" under Title VI, and DWS's failure to comply with those "language access" regulations is therefore relevant to whether DWS discriminated against her on the ground of national origin. We struggle to see how such a view can be reconciled with *Alexander v. Sandoval*, where the Supreme Court held there is no freestanding private right of action to enforce regulations promulgated under 42 U.S.C. § 2000d-1—a statute that confers authority to promulgate certain regulations. 532 U.S. at 293.

But even if Murguía is correct that we can consider the regulations she relies upon, DWS's violation of those regulations—by itself—is insufficient to demonstrate a prima facie case of intentional discrimination. *Cf. Mumid*, 618 F.3d at 795 (concluding "deficient programming in and of itself is not evidence of intentional discrimination based on national origin"); *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 291–92 (1998) (concluding failure to comply with a regulation "does not itself constitute 'discrimination' under Title IX"). And the other evidence Murguía points to runs headlong into our precedent that "language and national origin are not interchangeable." *Mumid*, 618 F.3d at 795 (citing

---

[4]A "program or activity" is defined to include "all of the operations of . . . a department, agency, special purpose district, or other instrumentality of a State or of a local government . . . any part of which is extended Federal financial assistance." 42 U.S.C. § 2000d-4a. There is no dispute that DWS receives federal funding for Title VI purposes.

[5]*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984).

[6]*Auer v. Robbins*, 519 U.S. 452 (1997).

*Hannoon v. Fawn Eng'g Corp.*, 324 F.3d 1041, 1048 (8th Cir. 2003)). *See also Soberal-Perez v. Heckler*, 717 F.2d 36, 41 (2d Cir. 1983); *Garcia v. Gloor*, 618 F.2d 264, 268 (5th Cir. 1980).

For example, Murguía points to DWS continuing to provide her forms and services in English despite knowing she spoke Spanish. But the first and only time she requested an interpreter was during an April 2021 visit. During that visit, DWS began searching for an interpreter after Murguía requested one. She waited for less than twenty minutes before signing a "Waiver of Interpreter Services" and leaving so that she would not be late to work. In effect, Murguía argues there is evidence of national origin discrimination when a recipient of federal funding hears an individual speak a language other than English yet fails to sua sponte offer translation and interpretation services. But Title VI's implied private right of action prohibits only intentional discrimination. *Alexander*, 532 U.S. at 280–81; *cf. Mumid*, 618 F.3d at 794–95. There is simply insufficient material evidence to show DWS as an agency treated Murguía worse than others who are similarly situated. Because Murguía does not present a prima facie case of intentional discrimination, the district court did not err in awarding the Director summary judgment.

Further, even if Murguía presented a prima facie case, we would still affirm the district court. When a plaintiff puts forth a prima facie case under *McDonnell Douglas*, the burden shifts to the Director to offer a "legitimate, nondiscriminatory reason" for Murguía's bureaucratic troubles. 411 U.S. at 802. The Director's reason "must be clear and reasonably specific." *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 258 (1981). And it is a burden "of production, not persuasion; it 'can involve no credibility assessment.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993)).

As the Director's reason for Murguía's troubles collecting unemployment insurance, she offers the pandemic and its effect on DWS's ability to adjudicate applications for unemployment insurance during the time period that Murguía

interacted with its employees. We have previously acknowledged operational changes associated with the pandemic in its "early months" as a legitimate, nondiscriminatory reason under *McDonnell Douglas*. *See Johnson v. Schulte Hosp. Grp., Inc.*, 66 F.4th 1110, 1114–15 (8th Cir. 2023). Consistent with this precedent, we next turn to pretext.

The district court concluded Murguía did not provide evidence of pretext. On appeal, Murguía argues the Director's reason is pretextual because it is unconnected to her treatment and thus "is unworthy of credence." The burden is on "the plaintiff to show that the offered reason is pretextual." *Lucke v. Solsvig*, 912 F.3d 1084, 1088 (8th Cir. 2019). A plaintiff can carry this burden under *McDonnell Douglas* by showing the "proffered explanation is unworthy of credence," *Burdine*, 450 U.S. at 256, "because it has no basis in fact." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1047 (8th Cir. 2011) (en banc) (citation omitted).

Murguía filed her application for unemployment insurance within weeks of the March 2020 national COVID emergency. In the following months, unemployment skyrocketed. For example, DWS had about 1,000 claims "on adjudication" in February 2020. By April 2020, the number of claims ballooned to 66,000. DWS began changing protocols, and many applicants had to wait in line for up to six hours. The unprecedented circumstances, in turn, drastically affected a core DWS responsibility: administering unemployment insurance. *See* Ark. Code §§ 11-10-501(b), 11-10-507.

Considering these circumstances and the other evidence, we disagree with Murguía that DWS's legitimate, nondiscriminatory reason for her troubles obtaining unemployment insurance is unworthy of credence. It is undisputed that Murguía's April 2020 electronic application for unemployment insurance listed the incorrect last employer. In June—mere months after the start of the pandemic and amid a massive uptick in applications—DWS was still operating under the erroneous assumption that Murguía's last employer was Molly Maid. When Murguía visited a DWS office twice in late August 2020, she tried to correct the misunderstanding

-8-

by providing paystubs. She later spoke with Parra, which culminated in DWS acknowledging the error about Murguía's last employer. Murguía then began receiving unemployment insurance before DWS asked Murguía to explain a discrepancy in her earnings. In response, Murguía visited a DWS office and, for the first time, requested an interpreter before leaving because DWS could not provide one in less than twenty minutes. DWS eventually determined Murguía did not correctly report her earnings, but it concluded she did not do so willfully in light of her language restrictions.

Despite this, Murguía insists her prima facie case is strong enough to establish pretext. "It is possible for strong evidence of a prima facie case to establish pretext," but, as we have explained, Murguía's "prima facie case was far from strong." *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 834 (8th Cir. 2002). So even if Murguía had presented a prima facie case of intentional discrimination, she has nonetheless failed to carry her burden under *McDonnell Douglas* of showing the reasons for her bureaucratic troubles were a pretext for intentional discrimination. *See Johnson*, 66 F.4th at 1115; *Bissada v. Ark. Children's Hosp.*, 639 F.3d 825, 833 (8th Cir. 2011).

In sum, the district court did not err by awarding the Director summary judgment.

## B. Deliberate Indifference

Murguía also argues the district court erred by rejecting her alternative request to apply a deliberate indifference standard when analyzing her Title VI claim. In support, she relies upon *Gebser v. Lago Vista Independent School District*, 524 U.S. 274 (1998), and *Davis ex rel. LaShonda D. v. Monroe County Board of Education*, 526 U.S. 629 (1999). While Murguía acknowledges *Gebser* and *Davis* involve Title IX, 20 U.S.C. § 1681, she insists the similarities between Title IX and Title VI warrant extending the cases to this context. She also argues that, under this standard, a jury could infer intentional discrimination based on "indifference to language access denials and Michaud's behavior." We review de novo whether the district

-9-

court applied the correct legal standard. *Karsjens v. Lourey*, 988 F.3d 1047, 1050 (8th Cir. 2021).

In *Gebser*, the Supreme Court considered when a school district can be held liable for damages under a Title IX implied private right of action for teacher-on-student sexual harassment. 524 U.S. at 277. Given that Title IX has a "contractual nature" in which "Congress attaches conditions to the award of federal funds" via its spending power, the Supreme Court's "central concern" was whether the funding recipient had notice of monetary liability. *Id.* at 287 (citing U.S. Const. art. I, § 8). Because Title IX has an administrative enforcement scheme that requires notice to an "appropriate person" and an opportunity to remedy a violation prior to an agency initiating enforcement proceedings, the Supreme Court reasoned it would be "unsound" to permit liability under the implied private right of action "without regard to the recipient's knowledge or its corrective actions upon receiving notice." *Id.* at 288–90. The Supreme Court then held a school district cannot be "liable in damages under Title IX for a teacher's sexual harassment of a student absent notice and deliberate indifference." *Id.* at 292–93.

The Supreme Court answered a different question in *Davis*: "whether, and under what circumstances, a recipient of federal educational funds can be liable [under Title IX] in a private damages action arising from student-on-student sexual harassment[.]" 526 U.S. at 637. The Supreme Court first rejected the argument that the plaintiff sought to hold the school board liable for the student's sexual harassment. *Id.* at 641. It reasoned the plaintiff instead sought "to hold the Board liable for its *own* decision to remain idle in the face of known student-on-student harassment in its schools." *Id.* Characterizing deliberate indifference under *Gebser* as a "high standard," *id.* at 643, the Supreme Court then concluded liability in damages attaches under Title IX "only where [funding recipients] are deliberately indifferent to sexual harassment, of which they have actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *Id.* at 650.

*Gebser* and *Davis* considered discrimination on the basis of sex under Title IX in the form of harassment in the school setting. Murguía advances neither a Title IX claim nor a harassment claim. We acknowledge the Supreme Court has in some ways "interpreted Title IX consistently with Title VI," *Barnes v. Gorman*, 536 U.S. 181, 185 (2002), at least in part because Congress "passed Title IX with the explicit understanding that it would be interpreted as Title VI was[.]" *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 258 (2009). The inverse, however, is not necessarily true. *Cf. Alexander v. Choate*, 469 U.S. 287, 293 n.7 (1985) (warning against a simplistic "assimilation of Title VI law to § 504"). And our review of *Gebser*, *Davis*, and the plain language of Title VI does not clearly demonstrate the deliberate indifference standard applies in this context. Indeed, our cases analyzing Title VI have instead applied *McDonnell Douglas*. *See Rowles v. Curators of Univ. of Mo.*, 983 F.3d 345, 355 (8th Cir. 2020); *Freeman v. Fahey*, 374 F.3d 663, 666 (8th Cir. 2004); *Fuller v. Rayburn*, 161 F.3d 516, 518 (8th Cir. 1998).

But even assuming for the sake of argument that the deliberate indifference standard applies, in light of our conclusion under *McDonnell Douglas*, Murguía fails to raise a genuine issue of material fact under the "high standard" of deliberate indifference. *See Davis*, 526 U.S. at 643, 650; *see also Doe v. Dardanelle Sch. Dist.*, 928 F.3d 722, 725 (8th Cir. 2019) ("Deliberate indifference is a stringent standard of fault that cannot be predicated upon mere negligence." (quoting *Doe v. Flaherty*, 623 F.3d 577, 584 (8th Cir. 2010))).

### III. Conclusion

We affirm the judgment of the district court.

KELLY, Circuit Judge, dissenting.

To prevail on her claim, Murguía is required to show that her "national origin motivated the defendant's discriminatory conduct." Rowles v. Curators of Univ. of Mo., 983 F.3d 345, 355 (8th Cir. 2020). To meet the "minimal" threshold of proof

necessary to establish her prima facie case, Young v. Warner-Jenkinson Co., 152 F.3d 1018, 1022 (8th Cir. 1998), Murguía need only present evidence that would give rise to an inference of national origin discrimination.[7] See Turner v. Gonzales, 421 F.3d 688, 694 (8th Cir. 2005) (noting that a plaintiff may establish her prima facie case by showing "she was treated differently from similarly situated" individuals or by providing "some other evidence that would give rise to an inference of unlawful discrimination" (citations omitted)).

In April 2020, Murguía and her daughter, Alejandra, visited DWS to file a claim for Murguía to receive unemployment benefits. Alejandra helped Murguía complete an application—which was in English—for benefits. A DWS employee at the front desk interacted with them and watched as Alejandra interpreted and translated information for Murguía. At that point, under DWS's own policy, the employee should have determined Murguía's "language need" as a limited English proficiency (LEP) person and offered to provide her a free interpreter. The employee also should have indicated in Murguía's file that she needed Spanish-language services and documents. The employee did neither.

Murguía soon began to receive notices from DWS about her unemployment claim. These letters were only in English. Whenever Murguía received a letter from the agency, she had to call Alejandra to interpret or translate for her. Alejandra had no formal Spanish-language training beyond one year of Spanish classes in high school, and she testified that she "would read [a] letter and try [her] best to explain

---

[7]The court cites Mumid v. Abraham Lincoln High School to conclude that "language and national origin are not interchangeable." 618 F.3d 789, 795 (8th Cir. 2010). While this may be true as a general statement, there is no doubt that language may be a proxy for intentional discrimination based on national origin. See, e.g., Kikumura v. Turner, 28 F.3d 592, 600 (7th Cir. 1994) ("It may well be, for certain ethnic groups and in some communities, that proficiency in a particular language, like skin color, should be treated as a surrogate for race [or national origin] . . . ." (quoting Hernandez v. New York, 500 U.S. 352, 371 (1991)). And at this stage, a reasonable jury could find that Murguía has proffered enough evidence to show a connection between her language and national origin.

it" to Murguía in Spanish. By August 2020, Murguía had received several letters from DWS containing "vital information" only in English.

On August 25, 2020, Murguía and Alejandra returned to the DWS office. Michaud, a DWS "front intake" employee, interacted with them and watched as Alejandra interpreted for Murguía. Like before, notwithstanding the agency's policy, there was no effort to offer Murguía an interpreter. Michaud directed Murguía and Alejandra to come back the next day with certain documents. The two returned the following day, but Michaud refused to look at the documents he requested they bring, dismissively stating that he had "never asked for them." What Michaud did, instead, was "run[] an immigration check" on Murguía. Murguía's immigration status, however, was "not in doubt." This "immigration check"—and Michaud's failure to document that he even ran it—was undisputedly contrary to the agency's policies and practices.

The record included additional information about Michaud. There was a perception in the DWS office that Michaud did not "like Latins," and that he generally spoke in a loud, angry voice when Latino or Hispanic unemployment claimants were in the office. Michaud, who had served in managerial positions at DWS, had once directed a bilingual Spanish-speaking DWS employee to stop assisting Spanish-speaking LEP claimants. He also sometimes directed DWS employees who spoke no Spanish to assist Spanish-speaking claimants. One subordinate testified that it "seemed pretty obvious" that Michaud did not want employees to call interpreters for Spanish-speaking claimants because he did not want the agency to pay for interpreters.

The Arkansas Legal Aid soon stepped in to assist Murguía, and on September 23, 2020, they informed the agency of Murguía's language-access issues. Murguía was put in touch with Parra, the agency's LEP coordinator for unemployment claims who was fluent in English and Spanish. Despite Parra's involvement, little changed. The agency still failed to note that Murguía required Spanish-language services, so Murguía continued to receive vital documents from

-13-

the agency in English only. And Murguía was still left to rely on Alejandra to interpret or translate information about her claim. For example, after Murguía received two form documents from the agency in English on November 3, 2020, Alejandra emailed Parra asking her to help Murguía complete these forms, which were due by the following week. It took Parra about six weeks to respond to the email from Alejandra, and in the interim, Alejandra completed the forms for Murguía. Murguía also tried reaching Parra by phone when she needed assistance, as DWS did not have a separate telephone line for individuals who require interpretation services. Sometimes, Parra returned Murguía's calls, but other times, she did not.

In March 2021, nearly a year after Murguía filed her unemployment claim, she began to receive benefits. But Murguía still lacked access to sufficient interpretation or translation services. In April and August 2021, the agency sent fraud notices to Murguía, alleging that she received benefits to which she was not entitled. These, too, were in English. Murguía contested the fraud allegations, and the agency held an appeal hearing where she received an interpreter for the first time. But even then, the interpreter's "version of questions in Spanish did not make sense to [her] sometimes," and in the middle of the hearing, the interpreter "stopped interpreting" and Murguía heard only English from then on. The agency later reversed its fraud determination based in part on the fact that Murguía "did not fully understand the unemployment laws due to her inability to speak English." Notably, DWS has a handbook with the unemployment laws and program rules, but the agency never provided this to Murguía.

Murguía's experiences with DWS were not isolated incidences. The record shows that DWS has struggled with systemic issues regarding access to its services by LEP claimants. In 2015, DWS was investigated by the Department of Labor (DOL) about deficiencies concerning access to the agency's services by LEP persons. Relevant here, the investigation revealed that DWS generally failed to provide "adequate interpretation services in a timely manner to LEP individuals," "adequate translation services in a timely manner," or "provide[] LEP individuals

-14-

with appropriate notice of language assistance services." The DOL concluded that DWS's "policies, procedures, and practices were inadequate to meet its obligations under Title VI . . . and the implementing regulations for these statutes." While DWS reached a settlement with the DOL in 2017, its shortcomings persisted. Between April 2020 and May 2021, other Spanish-speaking LEP claimants like Murguía had difficulties accessing DWS's services, such as the inability to reach Parra, receiving letters in English that they could not understand, and DWS employees' failure to find translators. English-speaking claimants, in contrast, did not experience the same obstacles to DWS's services.

In my view, a reasonable inference can easily be drawn that DWS's actions were motivated, at least in part, by a discriminatory purpose. See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 265–66 (1977); Pers. Adm'r of Mass. v. Feeney, 442 U.S. 256, 279 (1979). The agency does not dispute that in providing services to Murguía, it violated several of Title VI's implementing regulations—many of which are incorporated into DWS's Operations Manual. See, e.g., 29 C.F.R. § 38.9(h); id. § 38.9(g)(1); see Segal v. Metro. Council, 29 F.4th 399, 405 (8th Cir. 2022) (explaining that evidence "regarding a violation of a statute or regulation" is one "factor to be weighed by the jury" in deciding whether the defendant engaged in unlawful discrimination). And the record shows that the agency consistently deprived Murguía of services that she was entitled to. Considering DWS's "historical background" with respect to the provision of LEP services, the agency's departures from its own policies and procedures, see Arlington Heights, 429 U.S. at 267–68, and her own personal experiences with the agency, Murguía proffered sufficient evidence to allow a reasonable jury to infer that national origin motivated DWS's discriminatory conduct. See Rowles, 983 F.3d at 355.

DWS, however, explains away Murguía's experiences at its office by pointing to the COVID-19 pandemic. The agency states that "[t]he pandemic forced [it] to change its protocol in multiple ways," noting that it was "handling [a] historic number of unemployment cases," DWS employees "often had minimal interaction

-15-

with claimants in the early days of COVID-19," and that claimants had to "hand in paper applications" rather than "fill out their applications on computers inside local offices." And the agency relies on its "out-of-date computer system" to excuse the fact that Murguía received English-only documents.

But Murguía's claims concerned the deprivation of language services at DWS, and the agency failed to articulate the relationship between Murguía's claims and COVID-related changes. See Lucke v. Solsvig, 912 F.3d 1084, 1087 (8th Cir. 2019) ("Legitimate, non-discriminatory reasons must be clear and reasonably specific." (cleaned up)). Nevertheless, Murguía showed that her experience at the DWS office was unrelated to the pandemic. For example, Murguía offered evidence suggesting that there was no on-site interpreter at the local DWS branch—both before and after the pandemic. And in fact, Parra testified that there was "no guarantee" that an interpreter would even be available if a claimant like Murguía needed one.

Nor does DWS explain how an outdated computer system prevented it from providing Spanish-language translations. In fact, Parra testified that Spanish-language paper applications were available "at the local [DWS] office," and if a claimant "file[d] an unemployment claim [in Spanish], the [computer] system . . . trigger[ed] a Spanish . . . form." And to the extent DWS also relies on the pandemic here, there was no evidence to suggest that the pandemic prevented DWS from translating documents into Spanish. All told, Murguía has raised legitimate questions of fact regarding the validity of the reasons proffered by DWS. See Gibson v. Am. Greetings Corp., 670 F.3d 844, 854 (8th Cir. 2012) (noting that there are at least two routes for demonstrating a material question of fact as to pretext: showing the proffered explanation has no basis in fact or that a prohibited reason more likely motivated the defendant).

In my view, Murguía has established a prima facie case of intentional national origin discrimination. See Lewis v. City of Union City, 934 F.3d 1169, 1185 (11th Cir. 2019) ("[A] plaintiff will always survive summary judgment if [s]he presents a convincing mosaic of circumstantial evidence that would allow a jury to infer

intentional discrimination." (cleaned up)).  And on this record, material questions of fact remain regarding pretext.

      Respectfully, I dissent.

_____