PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
———

No. 16-3528
———

KHADIDJA ISSA; Q. M. H., A MINOR,
INDIVIDUALLY BY AND THROUGH HIS PARENT,
FAISA AHMED ABDALLA;
ALEMBE DUNIA; ANYEMU DUNIA; V. N. L.;
SUI HNEM SUNG, AND ALL OTHERS SIMILARLY
SITUATED

v.

THE SCHOOL DISTRICT OF LANCASTER,
                                    Appellant
———

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(E.D. Pa. No. 5-16-cv-03881)
District Judge:  Honorable Edward G. Smith
———

Argued December 5, 2016

Before:  FISHER, KRAUSE and MELLOY,[*] *Circuit Judges.*

(Filed: January 30, 2017)

Sharon M. O'Donnell
Marshall Dennehey Warner Coleman & Goggin
100 Corporate Center Drive, Suite 201
Camp Hill, PA 17011

Thomas A. Specht   **[ARGUED]**
Marshall Dennehey Warner Coleman & Goggin
P.O. Box 3118
Scranton, PA 18505
        *Counsel for Appellant*

Hedya Aryani
217 Ryers Avenue
Philadelphia, PA 1012

Seth Kreimer
University of Pennsylvania School of Law
3400 Chestnut Street
Philadelphia, PA 19104

Maura I. McInerney
Kristina Moon
Education Law Center
1315 Walnut Street, Suite 400
Philadelphia, PA 19107

---

[*] Honorable Michael J. Melloy, Senior Circuit Judge, United States Court of Appeals for the Eighth Circuit, sitting by designation.

Kathleen A. Mullen
Thomas B. Schmidt, III
Pepper Hamilton
100 Market Street, P.O. Box 1181
Suite 200
Harrisburg, PA 17108

Eric J. Rothschild
217 Ryers Avenue
Philadelphia, PA 1012

Molly M. Tack-Hooper
American Civil Liberties Union of Pennsylvania
P.O. Box 60173
Philadelphia, PA 19106

Witold J. Walczak   **[ARGUED]**
American Civil Liberties Union of Pennsylvania
313 Atwood Street
Pittsburgh, PA 15213
        *Counsel for Appellees*

Tovah R. Calderon
Erin H. Flynn
United States Department of Justice
Civil Rights Division, Appellate Section
P.O. Box 14403
Ben Franklin Station
Washington, DC 20044
        *Counsel for Amicus Appellee*

———

OPINION OF THE COURT

———

FISHER, *Circuit Judge*.

School-age refugees facing language barriers asked the District Court for a preliminary injunction compelling the School District of Lancaster to allow them to transfer from Phoenix Academy, an accelerated credit-recovery high school, to McCaskey High School's International School, a program designed principally to teach language skills to English language learners, or ELLs. The District Court granted that request, finding likely violations of Pennsylvania law and a provision of a federal statute we've never addressed—the Equal Educational Opportunities Act of 1974 (EEOA), 20 U.S.C. § 1703(f). The School District appeals, asking us to vacate that order. We will affirm based on the EEOA violations but not on the state law violations.

**I**

**A**

The named plaintiffs, now the appellees, are immigrants, ages 18 to 21. They fled war, violence, and persecution in their native countries to come to the United States, arriving here since 2014. International refugee agencies resettled them in Lancaster, Pennsylvania. None are native English speakers. As students, all fall within a subgroup of ELLs called SLIFE—students with limited or interrupted formal education. SLIFE are English language learners who are two or more years behind their appropriate grade level, possess limited or no literacy in any language,

4

have limited or interrupted formal educational backgrounds, and have endured stressful experiences causing acculturation challenges. The named plaintiffs embody these traits.

Born in January 1998, Khadidja Issa, 19, fled Sudan when she was 5 to escape "insecurity" under President Omar al-Bashir. J.A. 568–69, 980. Until age 17, she lived in refugee camps in Chad where she received her only prior schooling. Her native language is Fur. She also speaks Arabic. After immigrating here in October 2015, she was resettled with her family in Lancaster. When she first arrived, she couldn't speak, read, write, or understand any English. She's eligible to attend public school in Pennsylvania through 2019, the year she turns 21.[1]

Qasin Hassan (or Q. M. H.), 18, was born in Somalia in September 1998. When he was 12, al-Shabaab militants killed his father. He fled to Egypt. A native Somali speaker, he took private lessons at home and learned "a little bit" of Arabic, but he wasn't accepted into Egyptian schools. J.A. 575. He arrived in Lancaster with his family in September 2015 speaking only "a few words" of English. *Id.* Like Issa, he's eligible to attend public school in Pennsylvania through 2019, the year he turns 21.

---

[1] Pennsylvania law provides that "[e]very child" between ages 6 and 21 "may attend the public schools in his district" and that a child who reaches age 21 "during the school term and who has not graduated from high school may continue to attend the public schools in his district free of charge until the end of the school term." 24 Pa. Stat. § 13-1301. "A child's right to be admitted to school may not be conditioned on the child's immigration status." 22 Pa. Code § 11.11(d).

Sisters Sui Hnem Sung and Van Ni Iang (or V. N. I.), born in October 1996 and October 1998, fled Burma when their father was forced into labor there. Sung, 20, and Iang, 18, arrived with their family in Lancaster in November 2015. By then, Sung had completed ninth grade and Iang eighth, but neither spoke or understood any English. Their native language is Hakha Chin. Sung is eligible to attend public school in Pennsylvania through 2017, the year she turns 21, and Iang is eligible through 2019, when she turns 21.

War forced brothers Alembe and Anyemu Dunia, ages 21 and 19, to flee "very bad" circumstances in Tanzania to Mozambique, where life in refugee camps remained "very bad" and "very difficult." J.A. 615–16, 618. Native Swahili speakers, they were taught in Portuguese until the eighth or ninth grade when they could no longer afford schooling. With

their family, they arrived in Lancaster in November 2014 speaking "just basic" English, like "hello" and "hi." J.A. 618.[2]

### *The International School and Phoenix Academy*

The School District of Lancaster, the appellant in this case, administers numerous schools. Two are relevant here: McCaskey High School, which the School District operates directly, and Phoenix Academy, operated by Camelot Schools

---

[2] After the preliminary injunction issued, Alembe and Anyemu Dunia decided they no longer wished to attend school in the School District. Alembe is now 21 and Anyemu already earned a high school diploma at Phoenix, so both "wish to further their education at community college." Appellees' Resp. to Stay Mot. 4 n.2. Though the complaint's request for "supplemental educational services" as compensatory relief for the School District's alleged violations (J.A. 97) might in other circumstances sustain a live claim, here, the brothers have "chose[n] not to enroll" and disavowed any intention to "further their education" within the School District. Appellees' Resp. to Stay Mot. 4 n.2. Their claims for equitable relief are therefore moot. *See Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 669 (2016) ("If an intervening circumstance deprives the plaintiff of a personal stake in the outcome of the lawsuit, at any point during litigation, [his or her claims] can no longer proceed and must be dismissed as moot." (internal quotation marks omitted)). On remand, the District Court should dismiss them as such. Nevertheless, because the brothers' testimony and other evidence about their experiences with the School District formed, in part, the basis for this preliminary injunction, we consider it on appeal.

7

of Pennsylvania, LLC, a private, for-profit company under contract with the School District.

McCaskey High School consists of two smaller schools. One is J.P. McCaskey, a traditional public high school. The other is McCaskey East, known as the International School. The International School is a program designed primarily to teach language skills to students who speak little, if any, English.[3] Those students generally attend the International School for one year, after which they join J.P. McCaskey's general population. During that year, they receive "intensive ESL" (English as a second language) support through two 48-minute ESL courses per day. J.A. 901, 1071. For "content" classes—science, math, social studies, and other "enrichment subjects"—ELLs at the International School receive "content-based ESL" teaching through a method called "sheltered instruction." J.A. 901. Under that method, ELLs, including SLIFE, are grouped together in content courses with other ELLs at comparable English-proficiency levels. ELLs are hence "sheltered" in those classes from other ELLs at higher proficiency levels and from native English speakers. To foster English-language proficiency, the International School also introduces ELLs to new American "cultural values and beliefs" while respecting their "cultural diversity" and embraces "close communication

---

[3] Under 22 Pa. Code § 4.26, "[e]very school district shall provide a program for each student whose dominant language is not English for the purpose of facilitating the student's achievement of English proficiency and the academic standards" of 22 Pa. Code § 4.12. Programs "shall include appropriate bilingual-bicultural or English as a second language (ESL) instruction." *Id.* § 4.26.

with families" and "access to appropriate translation services." *Id.*

Phoenix Academy is, as the District Court said, "a little different." *Issa v. Sch. Dist. of Lancaster*, No. 16-3881, 2016 WL 4493202, at *2 (E.D. Pa. Aug. 26, 2016). It's an "alternative education program" intended to serve "at-risk Students" over-age for their grade, under-credited, and in danger of not graduating high school before they age out of public-school eligibility at 21. J.A. 904, 910. Phoenix's principal missions are to ensure that students accumulate enough credits to graduate and to change students' negative behaviors—not to further their academic proficiencies. A significant portion of grading is therefore based on students' behavior and attendance, known as "seat time." J.A. 544, 639. In step with its mission to change students' "anti-social" behaviors, J.A. 1039, Phoenix enforces stringent security measures not in effect at McCaskey, including daily pat-down searches. Phoenix bars its students from bringing in or out any personal belongings, like backpacks, food, books, and even homework. And a strict dress code is in place. Based on a hierarchical system, students are rewarded with different colored shirts as they demonstrate improved behavior.

Teaching is also different at Phoenix. All Phoenix students, including ELLs, take an accelerated curriculum allowing them to earn a high school diploma in roughly half (but sometimes less than half) the time of a traditional four-year high school, like McCaskey. Phoenix students take five 80-minute classes per day, generally completing each class in half an academic year (90 days). McCaskey students, in contrast, take seven 48-minute classes per day, generally completing each class in a full academic year (180 days). Under these different schedules, McCaskey students receive

9

about 1,440 more minutes, or twenty-four more hours, of instruction per class than do students at Phoenix, the equivalent of about thirty more 48-minute class periods per class. The upshot is, as one former Phoenix teacher put it, that Phoenix's curriculum must be taught "double time." J.A. 632.

Phoenix's program for teaching English to ELLs also differs from the International School's. Phoenix offers ELLs of all levels, with no special accommodations for SLIFE, one 80-minute ESL course per day. Otherwise, ELLs, including SLIFE, take all their content courses—science, math, social studies—with Phoenix's general population under the accelerated model. In those content classes, ELLs aren't sheltered from each other by their English proficiency or from native English speakers like they are at the International School.

How does the School District empirically evaluate the efficacy of Phoenix's ESL program? It doesn't. The School District does not assess in any measurable way whether Phoenix's program helps ELLs overcome their language barriers. It hasn't attempted to weigh concretely the impact Phoenix's accelerated, non-sheltered program has on ELLs, including SLIFE. Raw data about Phoenix's ESL program apparently exists. But the School District doesn't disaggregate it from data about the International School's ESL program. Because the two programs rely on different ESL teaching methods, commingling the data means the School District cannot quantify whether Phoenix's ESL program is successful.

### *The School District's Enrollment Policies and Practices*

Enrollment in Phoenix rather than McCaskey is usually a choice offered to students and their families. But one group of prospective students isn't offered that choice:

new-to-the-District students over age 17 and under-credited. For students in that category (which included the plaintiffs), the choice is made for them: The School District unilaterally assigns them to Phoenix and doesn't allow them to transfer to McCaskey. This mandatory enrollment rule applies regardless of a student's English proficiency or educational background and even if the student has several years of public school eligibility left under Pennsylvania law. The School District does this, it says, because these students represent a higher risk of dropping out or aging out at age 21 before earning a high school diploma, which is a prerequisite for future advancement. But the School District's funding and evaluations also turn, in part, on its graduation rates, which decline when students drop out or age out at 21.

Actual enrollment at Phoenix hasn't been a smooth process for these plaintiffs. While the School District unilaterally assigned them to Phoenix under the mandatory enrollment rule, their actual placement there proved far more difficult. They experienced significant delays between when they applied for enrollment and when they were either allowed to attend Phoenix or denied enrollment outright. The District Court said it well: In "no case" did the School District "accomplish the enrollment of the plaintiffs within the five-day period mandated by state law." *Issa*, 2016 WL 4493202, at *2. Iang and Sung were not permitted to start at Phoenix until December 2015 and February 2016, though they enrolled in November 2015. Issa enrolled in November 2015 but wasn't allowed to start at Phoenix until February 2016. Hassan was initially denied enrollment outright. He was later enrolled when the School District learned he was 17, not 19, a factor with "no legal significance" under Pennsylvania law. *Id.* And by when the injunction issued in late-August 2016, the School District had yet to enroll Alembe Dunia, despite

his "repeated attempts to enroll dating back to at least January 2015." *Id.*

### How Attending Phoenix Affected the Plaintiffs

For those plaintiffs ultimately admitted to Phoenix, a "common complaint" was that they didn't understand the "vast majority" of content taught in their non-ESL classes. *Issa*, 2016 WL 4493202, at *3. The plaintiffs all testified—through interpreters—that Phoenix's accelerated curriculum moved too quickly for them to grasp. Apart from their Phoenix ESL courses, the plaintiffs explained, they couldn't understand most of what their teachers and classmates were saying. Despite these difficulties, they accrued credits and advanced to higher grade levels.

Through her interpreter, Issa testified that Phoenix's classes went "very fast" and she didn't "understand anything." J.A. 572–73. She felt she wasn't "benefiting" there and wanted to attend a school "slower in pace." J.A. 573. When asked, she couldn't explain what two of her classes were about. In those classes, she said, her teachers and classmates spoke and wrote only in English, which she couldn't understand. Nevertheless, she was promoted to the next grade. Of eighty-four students in her class, she was ranked first.

Hassan testified through his interpreter that learning at Phoenix was "impossible" and he only understood his ESL teacher. J.A. 580. He couldn't understand his content-class teachers or classmates.

Through their interpreter, Iang and Sung explained they too had great difficulty understanding their content classes at Phoenix because they were all taught in English.

They couldn't understand their teachers or classmates, and there were "never" interpreters there to help. J.A. 558.

Anyemu Dunia graduated from Phoenix during the evidentiary hearing, earning a diploma in just sixteen months. He did so although he arrived in the United States without any academic credits or English-language proficiency, all while amassing forty-seven total absences. Despite his "readily apparent difficulties conversing in English" and his testimony that Phoenix's classes moved too "fast" for him, he graduated sixth in his class of 107. *Issa*, 2016 WL 4493202, at *3 & n.2; *see* J.A. 620, 1357.

**B**

In July 2016, the plaintiffs sued the School District in the District Court for the Eastern District of Pennsylvania requesting a preliminary injunction allowing them and similarly situated ELLs to enroll in and attend McCaskey. On behalf of a putative class, they allege violations of the EEOA, 20 U.S.C. § 1703(f); Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*; the Fourteenth Amendment's Due Process and Equal Protection Clauses; and 24 Pa. Stat. § 13-1301 of the Pennsylvania Public School Code of 1949 and various Pennsylvania regulations.

Following expedited discovery on the plaintiffs' preliminary-injunction motion, the District Court held a five-day evidentiary hearing. Eighteen witnesses testified and dozens of exhibits were entered into evidence. The plaintiffs' expert, Dr. Helaine Marshall, a specialist in teaching English to speakers of other languages (TESOL) and teaching ESL to SLIFE, testified at length.

On August 26, 2016, the District Court granted the plaintiffs' preliminary-injunction motion, finding likely

violations of the EEOA and state law. *Issa*, 2016 WL 4493202; *see* Order, 2016 WL 4493201.[4] On the plaintiffs' EEOA claims, the District Court held that the School District failed on prongs one and three of the three-part test penned in *Castaneda v. Pickard*, 648 F.2d 989, 1009–10 (5th Cir. 1981), a case we discuss in detail below. On their state law claims, the District Court found likely violations of the Public School Code and regulations in light of the School District's enrollment delays. It entered the following order:

> [P]ending final resolution of this matter, the school district shall:
>
> **1.** Enroll and permit the school-age plaintiffs, who so wish, to attend the main high school, McCaskey, beginning on August 29, 2016;
>
> **2.** Ensure that all plaintiffs are properly assessed for language proficiency and receive an appropriate and adequate program of language instruction, including assignment to the International School if appropriate, ESL instruction, modifications in the delivery of instruction and testing to facilitate their achievement of English proficiency and state academic standards, and interpretation and translation services, as required by law, to enable the plaintiffs and their parents to

---

[4] The District Court found it "unnecessary" to address the plaintiffs' "Title VI and constitutional claims" because relief granted on the EEOA and state law claims was "sufficient to resolve" the preliminary-injunction motion. *Issa*, 2016 WL 4493202, at *4. That conclusion is unchallenged on appeal.

meaningfully participate in education decisions;

**3.** Ensure that the plaintiffs have equal access to the full range of educational opportunities provided to their peers, including curricular and non-curricular programs and activities; and

**4.** The plaintiffs shall post a nominal bond of $1.00.

Order, 2016 WL 4493201, at *1. The District Court deferred deciding the plaintiffs' motion for class certification but urged the School District to "fairly apply" its preliminary-injunction order to "school-age refugees similarly situated" to the plaintiffs in "language proficiency." *Id.* at *1 n.1.

The School District filed this timely appeal, asking our Court to stay the injunction's enforcement. It informed us that, as of September 16, 2016, four of six named plaintiffs—excluding Alembe and Anyemu Dunia—and five similarly situated ELLs transferred to the International School after the injunction issued, one of whom requested reinstatement at Phoenix. Appellant's Resp. to Sep. 16, 2016 Order 1; *see supra* note 2. Later, our Court denied the School District's stay motion and ordered expedited briefing. The United States Department of Justice filed an *amicus* brief supporting the plaintiffs.

**II**

The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1367(a). We have jurisdiction over this interlocutory appeal under 28 U.S.C. § 1292(a)(1). *D.M. v. N.J. Dep't of Educ.*, 801 F.3d 205, 211 (3d Cir. 2015).

15

At the outset, we underscore the School District's heavy burden on appeal. In reviewing a preliminary-injunction order, findings of fact are assessed for clear error, legal conclusions are reviewed *de novo*, and the ultimate decision to grant relief is reviewed for abuse of discretion. *Del. Strong Families v. Attorney Gen. of Del.*, 793 F.3d 304, 308 (3d Cir. 2015). A finding of fact is clearly erroneous only if it's "completely devoid of minimum evidentiary support displaying some hue of credibility or bears no rational relationship to the supportive evidentiary data." *Havens v. Mobex Network Servs., LLC*, 820 F.3d 80, 92 (3d Cir. 2016) (internal quotation marks omitted). An abuse of discretion occurs only if the decision reviewed rests upon a clearly erroneous finding of fact, an errant conclusion of law, or an improper application of law to fact. *Mancini v. Northampton Cty.*, 836 F.3d 308, 314 (3d Cir. 2016). With these principles in mind, we turn to the legal standards for the issuance of a preliminary injunction.

## III

A preliminary injunction is an extraordinary remedy granted in limited circumstances. *Ferring Pharm., Inc. v. Watson Pharm., Inc.*, 765 F.3d 205, 210 (3d Cir. 2014). Those seeking one must establish that (A) they are likely to succeed on the merits of their claims, (B) they are likely to suffer irreparable harm without relief, (C) the balance of harms favors them, and (D) relief is in the public interest. *Id.* We address each element seriatim.

## A

We turn first to whether the plaintiffs demonstrated a likelihood of success on the merits of their EEOA and state law claims. To satisfy this requirement for preliminary relief, the movant need only prove a "prima facie case," not a

16

"certainty" she'll win. *Highmark, Inc. v. UPMC Health Plan, Inc.*, 276 F.3d 160, 173 (3d Cir. 2001). We do not require that the right to a final decision after trial be "wholly without doubt"; the movant need only show a "reasonable probability" of success. *Punnett v. Carter*, 621 F.2d 578, 583 (3d Cir. 1980) (internal quotation marks omitted); *see Singer Mgmt. Consultants, Inc. v. Milgram*, 650 F.3d 223, 229 (3d Cir. 2011) (en banc). We address the plaintiffs' EEOA claims first, followed by their state law claims.

**1**

This appeal requires us to interpret § 1703(f) of the EEOA, a provision we've never addressed and that the Supreme Court and our fellow Courts of Appeals have infrequently applied. We start where we always do when interpreting a statute: with its text. Passed in 1974 as a floor amendment to the Elementary and Secondary Education Act of 1965, the EEOA states in § 1703(f) that "[n]o State shall deny equal educational opportunity to an individual on account of his or her race, color, sex, or national origin, by . . . the failure by an educational agency to take appropriate action to overcome language barriers that impede equal participation by its students in its instructional programs." 20 U.S.C. § 1703(f). An "individual" denied an equal educational opportunity may bring a civil action in federal court "against such parties, and for such relief, as may be

appropriate."[5] *Id.* § 1706. The EEOA limits court-ordered remedies to those that are "'*essential* to correct particular denials of equal educational opportunity.'" *Horne v. Flores*, 557 U.S. 433, 450 (2009) (quoting 20 U.S.C. § 1712).

Based upon these provisions, we hold that an individual alleging a violation of § 1703(f) must satisfy four elements: (1) the defendant must be an educational agency, (2) the plaintiff must face language barriers impeding her equal participation in the defendant's instructional programs, (3) the defendant must have failed to take appropriate action to overcome those barriers, and (4) the plaintiff must have been denied equal educational opportunity on account of her

---

[5] We note there's no dispute the plaintiffs are "individuals" under the EEOA, their refugee status notwithstanding. The EEOA was "enacted pursuant to § 5 of the Fourteenth Amendment," *Horne v. Flores*, 557 U.S. 433, 440 n.1 (2009) (citing 20 U.S.C. § 1702(a)(1), (b)), and entitles "*all children* enrolled in public schools" equal educational opportunity, 20 U.S.C. § 1701(a)(1) (emphasis added). It is well established that the Fourteenth Amendment guarantees immigrant children, whatever their legal status, equal access to public education. *Plyler v. Doe*, 457 U.S. 202, 216–24 (1982).

race, color, sex, or national origin. *See* 20 U.S.C. § 1703(f); *id.* § 1720(a) (defining "educational agency").[6]

Here, there is no dispute the plaintiffs satisfied § 1703(f)'s first element. The School District does not quibble with the District Court's conclusion that it is an "educational agency" under §§ 1703(f) and 1720(a). *See Issa*, 2016 WL 4493202, at \*1 & n.1. We see no reason to disturb that conclusion on appeal, as the EEOA expressly contemplates "local educational agencies," like the School District, in defining an "educational agency." 20 U.S.C. § 1720(a); *see id.* § 7801(30)(A).

---

[6] The District Court said that to prevail under § 1703(f), a plaintiff need only show "(1) language barriers; (2) defendant's failure to take appropriate action to overcome these barriers; and (3) a resulting impediment to students' equal participation in instructional programs." *Issa*, 2016 WL 4493202, at \*5. It relied on a Middle District of Pennsylvania decision to so hold. *Id.* (citing *CG v. Pa. Dep't of Educ.*, 888 F. Supp. 2d 534, 575 (M.D. Pa. 2012)). We affirmed judgment in *CG* but had no occasion to reach the EEOA claims at issue there. *CG v. Pa. Dep't of Educ.*, 734 F.3d 229 (3d Cir. 2013). Addressing § 1703(f) directly here for the first time, we find this three-element test incomplete. It ignores § 1703(f)'s "educational agency" and "on account of" language. The four-element test we set forth above gives proper effect to all of § 1703(f)'s text, as required. *See Corley v. United States*, 556 U.S. 303, 314 (2009) (stating that a statute "should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant" (internal quotation marks omitted)).

Likewise, there is no genuine dispute the plaintiffs satisfied § 1703(f)'s second element. The record here is replete with evidence the named plaintiffs, all SLIFE, face formidable language barriers. All testified through interpreters that they couldn't understand their content courses taught in English at Phoenix. Given this evidence, we agree the plaintiffs demonstrated language barriers impeding their equal participation in the School District's instructional programs, satisfying § 1703(f)'s second element. *See Issa*, 2016 WL 4493202, at *7 n.5 (stating that the parties "do not dispute" the plaintiffs' language barriers and crediting the plaintiffs' testimony that "their participation was impeded").

Because elements one and two of § 1703(f)'s prima facie case are met, we move to § 1703(f)'s more difficult third and fourth elements.

### Section 1703(f)'s Third Element: "Appropriate Action"

To satisfy § 1703(f)'s third element in the context of a preliminary-injunction motion, the plaintiffs must adduce evidence of a reasonable probability that the School District failed to take "appropriate action" to "overcome" their language barriers. Because the EEOA itself doesn't define "appropriate action," we must look elsewhere for guidance.

We turn first to the Supreme Court's decision in *Lau v. Nichols*, 414 U.S. 563 (1974), issued just before Congress passed the EEOA. There, a school district failed to provide any English-language instruction to a significant number (about 60 percent) of its Chinese students. *Id.* at 564. Those students filed suit, alleging violations of Title VI, which restricts federal funding for entities that discriminate based on race, color, or national origin. *Id.* at 565. Finding adequate proof of a Title VI violation, the Court stressed the importance of language instruction in American education.

> There is no equality of treatment merely by providing students with the same facilities, textbooks, teachers, and curriculum; for students who do not understand English are effectively foreclosed from any meaningful education. Basic English skills are at the very core of what . . . public schools teach. Imposition of a requirement that, before a child can effectively participate in the educational program, he must already have acquired those basic skills is to make a mockery of public education. We know that those who do not understand English are certain to find their classroom experiences wholly incomprehensible and in no way meaningful.

*Id.* at 566. Because no "specific remedy" was requested, the Court left that question open, suggesting the school district had latitude to decide how it would comply with Title VI: "Teaching English to the students of Chinese ancestry who do not speak the language is one choice. Giving instructions to this group in Chinese is another. There may be others." *Id.* at 564–65.

*Lau*'s pronouncements about Title VI were later called into question, and the Supreme Court ultimately recognized its abrogation on that ground. *See Alexander v. Sandoval*, 532 U.S. 275, 285 (2001) ("[W]e have since rejected *Lau*'s interpretation of [Title VI.]"). In enacting § 1703(f), however, Congress embraced *Lau*'s "essential holding" that "schools are not free to ignore the need of limited English speaking children for language assistance." *Castaneda*, 648 F.2d at 1008.

Following *Lau* and § 1703(f)'s enactment, the Fifth Circuit handed down *Castaneda v. Pickard* in 1981. Claiming violations of § 1703(f), Mexican-American students sued their school district, alleging its failure to implement a bilingual-education program impeded their ability to overcome language barriers. *Id.* at 992. Measuring § 1703(f)'s reach, the Fifth Circuit found that by using the "less specific term, 'appropriate action,'" Congress left state and local authorities a "substantial amount of latitude" to choose the "programs and techniques they would use" to satisfy § 1703(f)'s mandate. *Id.* at 1008. But too much latitude, the court cautioned, would render § 1703(f) a nullity. Accordingly, the Fifth Circuit held that state educational agencies must make a "genuine and good faith effort, consistent with local circumstances and resources, to remedy the language deficiencies of their students" under § 1703(f), and noted that Congress "deliberately placed on federal courts the difficult responsibility of determining whether that obligation [is] met." *Id.* at 1009. Without guidance from Congress on what "appropriate action" looks like, however, the Fifth Circuit found itself, like we are now,

> confronted with a type of task which federal courts are ill-equipped to perform and which we are often criticized for undertaking— prescribing substantive standards and policies for institutions whose governance is properly reserved to other levels and branches of our government (i.e., state and local educational agencies) which are better able to assimilate and assess the knowledge of professionals in the field.

22

*Id.* Nevertheless, the court charted a path forward, fashioning a "mode of analysis" to fulfill the responsibility Congress reposed in the federal courts under § 1703(f) without "unduly substituting" its "educational values and theories" for the "educational and political decisions" reserved to state and local school authorities and the "expert knowledge of educators." *Id.* That "mode of analysis," it said, is threefold. *First*, courts

> examine carefully the evidence the record contains concerning the soundness of the educational theory or principles upon which the challenged program is based. This, of course, is not to be done with any eye toward discerning the relative merits of sound but competing bodies of expert educational opinion . . . . The court's responsibility . . . is only to ascertain that a school system is [pursuing] a program informed by an educational theory recognized as sound by some experts in the field or, at least, deemed a legitimate experimental strategy.

*Id. Second*, courts determine whether the programs and practices "actually used" by the school system are "reasonably calculated to implement effectively the educational theory adopted by the school." *Id.* at 1010. And *third*, if an otherwise-sound and effectively-implemented program fails to "produce results" indicating that language barriers are "actually being overcome," it may "no longer constitute appropriate action." *Id.* Applying this test, the Fifth Circuit found "serious doubts" under prong two about the language competency of teachers employed in the school

district's bilingual classrooms and remanded for an evidentiary hearing. *Id.* at 1012–13, 1015.

Courts have consistently followed *Castaneda*'s approach to apply § 1703(f)'s third element, requiring "appropriate action." *See, e.g.*, *United States v. Texas*, 601 F.3d 354, 365–73 (5th Cir. 2010); *Mumid v. Abraham Lincoln High Sch.*, 618 F.3d 789, 796 (8th Cir. 2010); *Gomez v. Ill. State Bd. of Educ.*, 811 F.2d 1030, 1037, 1040–42 (7th Cir. 1987); *United States v. Texas*, 680 F.2d 356, 371 (5th Cir. 1982). And in *Horne v. Flores*, the Supreme Court relied on *Castaneda* to apply § 1703(f), 557 U.S. at 440–41, 454–55, though it did not adopt the Fifth Circuit's test explicitly, *id.* at 458 n.8 (expressing no view on "whether or not this test provides much concrete guidance regarding the meaning of 'appropriate action'"). Given these decisions and the parties' agreement that *Castaneda* should here guide our analysis, we will apply the Fifth Circuit's three-part test. Though we decline to adopt "without qualification" *Castaneda*'s framework and think "fine tuning must await future cases," we believe this test, as a general matter, properly balances § 1703(f)'s "allocation of responsibilities between the courts and the schools" and hence provides a "fruitful starting point" for our analysis under § 1703(f)'s third element. *Gomez*, 811 F.2d at 1041.

Applying *Castaneda* here to resolve whether the School District took "appropriate action" to overcome the plaintiffs' language barriers under § 1703(f), we agree with

the District Court: The School District foundered on *Castaneda*'s first and third prongs. We explain why below.[7]

### Castaneda *Prong One*

On *Castaneda*'s first prong—satisfied where an educational agency fails to pursue a program informed by an educational theory recognized as sound by some experts in the field—the plaintiffs showed a reasonable probability of success. Their expert, Dr. Marshall, testified consistently and at length that Phoenix's accelerated, non-sheltered program for ELLs is unsound for SLIFE (again, students with limited or interrupted formal education). The plaintiffs and two former Phoenix teachers corroborated her testimony. The School District did not rebut it with another expert or through contrary research. We see no clear error here.

SLIFE, Dr. Marshall emphasized, generally struggle or have yet to learn to read or write in *any* language, including

---

[7] Because the District Court concluded Phoenix's accelerated, non-sheltered program doesn't satisfy *Castaneda*'s first and third prongs, it didn't address *Castaneda*'s second prong—whether the programs and practices actually used by the School District are reasonably calculated to implement effectively the educational theory adopted. This wasn't error. The District Court was right that *Castaneda*'s test is "conjunctive." *Issa*, 2016 WL 4493202, at \*6. All three prongs must be met for an educational agency's program to satisfy § 1703(f)'s "appropriate action" element. *See Castaneda*, 648 F.2d at 1009–10. While we thank the United States as *amicus curiae* for its thoughtful analysis of *Castaneda*'s second prong, given the plaintiffs' successful showings under prongs one and three, we need not and do not reach *Castaneda*'s second prong here.

their native languages. Not only must they learn English in American schools, she explained, they must learn *how to learn* there. *See* J.A. 651 ("[W]e have to teach [SLIFE] for the first time how to read in a language that isn't even a language they speak yet."); J.A. 652 (describing how teaching in the United States relies on "decontextualized tasks"— multiple choice, matching, and true-false questions—that foreign students are "completely unaware of"). Dr. Marshall said that for SLIFE to succeed, teaching must "go more slowly and build, build the language, build the literacy," and "fill in the gaps." J.A. 656. This testimony went unchallenged.

Given SLIFE's need for unhurried and deliberate literacy and language development, Dr. Marshall opined that Phoenix's accelerated curriculum is "totally inappropriate" for them. *Id.*; *see* J.A. 671 ("For SLIFE . . . it is contraindicated. It is the opposite of what they need."). Students like the plaintiffs who are "behind academically" and "don't understand English," she explained, "cannot be expected to go faster through content when they haven't reached a threshold of English." J.A. 656. Her view, she attested, accords with those of other experts in the field. She was unaware of any contrary research, and the School District didn't point to any. "Uniformly," she said, "the field in talking about [SLIFE] talks about going more slowly, building in redundancy, building in repetition, and having them become familiar with material in many different ways in order for them to learn it, and *not to go at double time*." *Id.* (emphasis added); *see* J.A. 658 ("Again and again they say the key is to take your time, present [the material] in a variety of ways, make sure they get it . . . and nobody is talking about accelerating."). No evidence was presented that an

26

accelerated curriculum, on its own, is accepted as sound educational theory for SLIFE.

Dr. Marshall also opined consistently that "sheltered instruction" content classes, like those offered at the International School, are "needed" for SLIFE, J.A. 661–63, 667, and that Phoenix's commingling of SLIFE with higher-level ELLs and native English speakers, when combined with accelerated content courses, is not accepted as sound educational theory, J.A. 666 ("[I]f you're going to try and have newcomers with very little English . . . mixed in with fluid English speakers . . . what happens is that it becomes overwhelming for the lower level ELLs."); *see* J.A. 667 ("SLIFE need an entire day of instruction that's tailored to them."); J.A. 669 ("[W]hen [SLIFE are] in their content classes with native speakers . . . they're not understanding what's happening, they're really not progressing, they're not moving forward . . . [b]ecause they're not actually learning the material."). Here too, no evidence was adduced that accelerated, unsheltered instruction is accepted as sound educational theory for SLIFE. The plaintiffs' own testimony, cited extensively above, confirmed their great difficulty in understanding their accelerated, non-sheltered content classes at Phoenix.

Former Phoenix teacher Jandy Rivera reinforced Dr. Marshall's and the plaintiffs' testimony, explaining that her "refugee students" were "not able to master the material" in Phoenix's accelerated, non-sheltered program. J.A. 633. She stated that "[a]t the fast pace and atmosphere at Phoenix," refugee students were "not able to learn"; that these students "needed a regularly paced atmosphere, or perhaps even an extended learning atmosphere in order to master the material"; and that in her experience, Phoenix's program

27

"didn't work" for newly arrived ELLs. *Id.* Phoenix's lead-ESL teacher, Marianne Ortiz, similarly corroborated Dr. Marshall's testimony, stating that the International School is a "better placement for entering students" because it's not "accelerated" and gives ELLs "sheltered [instruction] content classes." J.A. 837. Given this evidence, we see no clear error in the District Court's findings that

> [w]hen a student with no ability to speak or understand English, such as the plaintiffs, is placed in accelerated classes, the student will cover material twice as fast as a normal school, but that material is also taught in a language that student does not understand. *On its face, this practice appears to be counterintuitive*; expert testimony confirmed that the practice was unsound . . . . The District did not offer any expert to the contrary. Instead, the District offered its ESL Coordinator [Amber Hilt], who testified that the "structured immersion" technique is a sound theory generally for overcoming language barriers, but nothing persuasive to the court to contradict Dr. Marshall's testimony that this technique was not recognized as sound for an accelerated, credit-recovery program. *The Phoenix model of accelerated learning presents different language barriers than a traditional education program, and is particularly imposing for students who cannot yet understand the language in which the courses are taught.*

*Issa*, 2016 WL 4493202, at *3, *6 (emphasis added).

28

On appeal, the School District attempts merely to impeach the credibility of Dr. Marshall's testimony. It points out, for example, that Dr. Marshall "neglected" to "personally observe" Phoenix's "classrooms/environments," although Rivera and Ortiz and all six named plaintiffs reinforced her testimony. Appellant's Br. 43. It says Dr. Marshall was a mere "teacher of teachers," not an ESL instructor, without explaining why that might render the District Court's reliance on her testimony clearly erroneous. *Id.* And it says Dr. Marshall contradicted herself when she testified that "immersion" of ELLs in content classes with native speakers impeded their progress, not necessarily acceleration. *Id.* at 44. But when we consider the record en bloc, these alleged blemishes in Dr. Marshall's testimony fail to persuade us that the District Court's findings are "completely devoid of minimum evidentiary support displaying some hue of credibility" or bear "no rational relationship to the supportive evidentiary data," as required to show clear error. *Havens*, 820 F.3d at 92 (internal quotation marks omitted).

For these reasons, the District Court did not err in concluding that the plaintiffs showed a reasonable probability that Phoenix's accelerated, non-sheltered program isn't informed by an educational theory recognized as sound by some experts in the field, as required under *Castaneda*'s first prong.

Castaneda *Prong Three*

On *Castaneda*'s third prong—satisfied where an educational agency's programs fail to produce results indicating that language barriers are actually being overcome—we agree with the District Court that the plaintiffs demonstrated a likelihood of success. The evidence shows that the School District doesn't keep separate data on the

efficacy of Phoenix's ESL program. This rendered it difficult, if not impossible, for the District Court to ascertain whether the plaintiffs' language barriers were actually being overcome at Phoenix. Given this evidence, we see no clear error in the District Court's findings, unchallenged on appeal, that

> [u]ndisputed testimony offered in court shows that the District does not evaluate whether the "language barriers confronting students are actually being overcome" at Phoenix [as required by *Castaneda*]. The ESL Coordinator [Hilt] acknowledged that "there is no data . . . that would allow us to determine whether . . . the ESL delivered to these students in . . . Phoenix['s] accelerated model is working or not." [J.A. 734.] Because the District did not disaggregate the Phoenix data to make this assessment, it could not demonstrate the effectiveness of the program to the court. Through her own efforts, Dr. Marshall was able to discern from limited data provided by the District that Phoenix's performance on literacy measures—the core measure of "overcoming language barriers"—was far worse than McCaskey's.

*Issa*, 2016 WL 4493202, at *6. The School District's Superintendent, Dr. Damaris Rau, confirmed that the effectiveness of Phoenix's ESL program had yet to be evaluated. J.A. 746–47. This further supports the District Court's findings.

On appeal, the School District argues Phoenix's ESL instruction "is and continues to be successful." Appellant's Br. 44. To bolster that point, it notes that one named plaintiff,

30

Anyemu Dunia, graduated from Phoenix and read an essay aloud in court, while "many" other unspecified ELLs have gone on to college after graduating Phoenix. *Id.* (citing J.A. 627). Though he could read an essay aloud in court, the District Court found that Anyemu had "readily apparent difficulties conversing in English," *Issa*, 2016 WL 4493202, at *3 n.2, and Anyemu himself testified that he could only "catch . . . some word[s]" when his English-speaking teachers talked to him in class, J.A. 620. Even if we were to accept this as sufficient indicia of Anyemu's progress, his ability to read a portion of an essay in court says nothing about whether the other four named plaintiffs were overcoming their own language barriers at Phoenix. The record here amply supports the District Court's conclusion that they were not. As explained before, all testified they couldn't understand what their teachers and classmates were saying in their content classes at Phoenix. This argument therefore fails to show clear error.

We also find unavailing the School District's contention, in its papers and at oral argument, that an ELL's ability to graduate Phoenix, on its own, weighs in the School District's favor under § 1703(f). On this record, we see little evidence of a meaningful connection between ELLs graduating from Phoenix's accelerated, non-sheltered program and ELLs actually overcoming their language barriers there. On the contrary, there is ample evidence supporting the District Court's finding that "[a]lthough the student earns (or at least is issued) a diploma and all of the attendant benefits, the student will likely graduate [Phoenix] with limited ability, if any, to converse in English—also often a prerequisite to future advancement—and limited understanding of the content of the courses he actually took." *Issa*, 2016 WL 4493202, at *3. We therefore conclude that

the plaintiffs showed a likelihood that Phoenix's program fails to produce results indicating that their language barriers are actually being overcome, as required under *Castaneda*'s third prong.

Because the plaintiffs showed a likelihood of success under *Castaneda*'s three-part test, they met § 1703(f)'s third element, requiring proof that the School District failed to take "appropriate action" to "overcome" their language barriers.

### *Section 1703(f)'s Fourth Element: "On Account of" a Protected Characteristic*

We now address § 1703(f)'s fourth and final element, which requires proof the plaintiffs were denied equal educational opportunity on account of their race, color, sex, or national origin. *See* 20 U.S.C. § 1703(f). We hold they met this element.

The Supreme Court has yet to address how the preamble to § 1703, which includes the "on account of" language here in issue, interacts with the rest of § 1703 and subsection (f) in particular. The Court did not discuss the matter in *Horne v. Flores*, 557 U.S. 433, so we look elsewhere. In its entirety, § 1703 provides that

> [n]o State shall deny equal educational opportunity to an individual *on account of* his or her race, color, sex, or national origin, by—
>
> **(a)** the deliberate segregation by an educational agency of students on the basis of race, color, or national origin among or within schools;

**(b)** the failure of an educational agency which has formerly practiced such deliberate segregation to take affirmative steps, consistent with part 4 of this subchapter, to remove the vestiges of a dual school system;

**(c)** the assignment by an educational agency of a student to a school, other than the one closest to his or her place of residence within the school district in which he or she resides, if the assignment results in a greater degree of segregation of students on the basis of race, color, sex, or national origin among the schools of such agency than would result if such student were assigned to the school closest to his or her place of residence within the school district of such agency providing the appropriate grade level and type of education for such student;

**(d)** discrimination by an educational agency on the basis of race, color, or national origin in the employment, employment conditions, or assignment to schools of its faculty or staff, except to fulfill the purposes of subsection (f) below;

**(e)** the transfer by an educational agency, whether voluntary or otherwise, of a student from one school to another if the purpose and effect of such transfer is to increase segregation of students on the basis of race, color, or national origin among the schools of such agency; or

> **(f)** the failure by an educational agency to take appropriate action to overcome language barriers that impede equal participation by its students in its instructional programs.

The School District suggests § 1703's preamble requires the plaintiffs to prove it failed to take appropriate action to overcome their language barriers *on account of* their national origins under § 1703(f). The School District interprets "on account of" to require a showing of intentional discrimination, contending there's insufficient evidence the plaintiffs' national origins "motivated their placement at Phoenix." Reply Br. 3–4.[8] We reject this reading of § 1703.

We start with what § 1703(f) *doesn't* require when read together with § 1703's "on account of" language: a showing of discrimination of any kind, intentional or otherwise, on account of an EEOA-protected characteristic. Congress expressly included the word "discrimination" in §

---

[8] The School District raised this argument only in passing in the District Court and for the first time on appeal in its reply brief. We could therefore consider it waived. *See Prometheus Radio Project v. FCC*, 824 F.3d 33, 53 (3d Cir. 2016) (arguments raised for the first time in a reply brief are waived on appeal); *P.R.B.A. Corp. v. HMS Host Toll Roads, Inc.*, 808 F.3d 221, 224 n.1 (3d Cir. 2015) (arguments not squarely put before the district court are waived on appeal). But the School District's "on account of" argument turns on a pure question of law about a matter of public importance, so we'll exercise our discretion to consider it. *See Huber v. Taylor*, 469 F.3d 67, 74 (3d Cir. 2006); *Bagot v. Ashcroft*, 398 F.3d 252, 256 (3d Cir. 2005); *Loretangeli v. Critelli*, 853 F.2d 186, 190 n.5 (3d Cir. 1988).

1703(d) but omitted it from § 1703(f). *See Castaneda*, 648 F.2d at 1007–08. And in subsections (a) and (e) of § 1703, Congress explicitly required showings of "deliberate" and "purpose[ful]" conduct, but merely required proof of a "fail[ure]" to take appropriate action under § 1703(f). *See id.* Where Congress "includes particular language in one section of a statute"—here, the word "discrimination" and language connoting intentional conduct in subsections (a), (d), and (e)—but "omits it in another section of the same Act"—here, subsection (f)—we presume it acted "intentionally and purposely" in so doing. *Dean v. United States*, 556 U.S. 568, 573 (2009); *see Bd. of Trustees of IBT Local 863 Pension Fund v. C & S Wholesale Grocers, Inc.*, 802 F.3d 534, 545 (3d Cir. 2015). We therefore join the Fifth Circuit in holding that § 1703(f) prohibits the mere failure by an educational agency to take appropriate action to overcome students' language barriers, "regardless of whether such a failure is motivated by an intent to discriminate against those students." *Castaneda*, 648 F.2d at 1008. And we add that, because § 1703(f) doesn't say "discrimination," there's no requirement under it to prove discrimination of any kind, including, for example, disparate impact discrimination.[9] This reading

---

[9] The School District's argument is premised on the notion that "on account of" in § 1703's preamble not only modifies the denial of "equal educational opportunity" but also the particular state action or inaction proscribed in each of § 1703's subsections. The statute's language, however, doesn't support that reading. The preamble merely states a general prohibition on the denial of equal educational opportunity "on account of" a protected characteristic violated *per se* "by" the state acting or failing to act in accordance with subsections (a) through (f). Each subsection

35

thus creates a separate cause of action for the denial of equal educational opportunity on account of an EEOA-protected characteristic, and none requires proof that the state's action or inaction was itself "on account of" such a characteristic.

The School District's reading also fails to distinguish between the phrase "on the basis of" a protected characteristic—which Congress has used traditionally and in this very statute to designate discriminatory intent, *see* §§ 1702(a)(1), 1703(a), (e)—and the phrase "on account of" a protected characteristic, which we presume, consistent with basic canons of statutory construction, Congress used intentionally in § 1703's preamble to convey a different meaning. *See Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n.9 (2004); *William A. Graham Co. v. Haughey*, 568 F.3d 425, 435 (3d Cir. 2009).

accords with the Supreme Court's observation in *Horne*, 557 U.S. at 472, that § 1703(f) requires educational agencies to "tak[e] 'appropriate action' to teach English to students who grew up speaking another language," and with *Lau*'s "essential holding" that "schools are not free to ignore the

---

Further, as applied to § 1703's other subsections, the School District's "on account of" interpretation would violate two more canons of construction. First, it would render portions of § 1703(a), (c), and (d) superfluous by requiring a plaintiff to prove that the "segregation" or "discrimination" these subsections already specify was "on the basis of race, color, or national origin" *and* "on account of race, color, sex, or national origin." *See Gustafson v. Alloyd Co.*, 513 U.S. 561, 574 (1995); *Zimmerman v. Norfolk S. Corp.*, 706 F.3d 170, 185 (3d Cir. 2013). Second, it would render § 1703(b) and (e) nonsensical by requiring a plaintiff to establish both that the state failed to affirmatively remediate the disparate impact of past discrimination on the basis of race, color, or national origin *and* that the failure itself was "on account of . . . race, color, sex, or national origin." *See Corley*, 556 U.S. at 314; *G.L. v. Ligonier Valley Sch. Dist. Auth.*, 802 F.3d 601, 615 (3d Cir. 2015). We therefore reject the School District's reading of § 1703's "on account of" language.

37

need of limited English speaking children for language assistance," *Castaneda*, 648 F.2d at 1008.[10]

We end with what § 1703(f) *does* require when read together with § 1703's "on account of" language: a nexus between the lost educational opportunity alleged and an EEOA-protected characteristic. Stated differently, we hold that the denial of the equal educational opportunity—in § 1703(f)'s case, the language barrier that is not being overcome—must stem from race, color, sex, or national origin, rather than from, for example, a cognitive disability covered by a different remedial scheme, like the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq.* Applying this reading here, we conclude the record fully supports that the plaintiffs' language barriers, and hence their

---

[10] The School District says the Eighth Circuit's 2010 decision in *Mumid v. Abraham Lincoln High School*, 618 F.3d 789, controls this issue. It doesn't. Specifically, the School District points to *Mumid*'s statement that a "policy that treats students with limited English proficiency differently than other students . . . does not facially discriminate based on national origin." *Id.* at 795. The School District omits, however, that the Eighth Circuit said that in addressing *Title VI* claims, not EEOA claims. *See id.* at 793–95. When the Court of Appeals dealt with the students' EEOA claims in *Mumid*, it did so on standing grounds, noting expressly that it would "assume" without deciding that evidence of the school's failure to take appropriate action to overcome language barriers "*could* support a finding that the District denied equal educational opportunity 'on account of . . . national origin.'" *Id.* at 795–96 (emphasis added). *Mumid* therefore doesn't support—and actually hurts—the School District's position.

lost educational opportunities, stem from their national origins.

Thus, the plaintiffs satisfied § 1703(f)'s fourth element, as they were denied equal educational opportunity "on account of" an EEOA-protected characteristic: their national origins. Given the plaintiffs' successful showings under all four of § 1703(f)'s elements, we agree with the District Court that they demonstrated a likelihood of success on their EEOA claims.

**2**

We turn now to whether the plaintiffs demonstrated a reasonable probability of success on the merits of their state law claims. Because neither the plaintiffs nor the District Court addressed the threshold question whether the plaintiffs' state law claims are cognizable, we'll remand for the District Court to consider that question in the first instance.

In Pennsylvania, every child who hasn't graduated from high school "may attend" the public schools in her district until the end of the school year in which she turns 21. 24 Pa. Stat. § 13-1301; *see* 22 Pa. Code §§ 11.12, 12.1(a). "A child's right to be admitted to school may not be conditioned on the child's immigration status." 22 Pa. Code § 11.11(d). A school district "shall normally enroll a child the next business day, but no later than [within] 5 business days of application." *Id.* § 11.11(b). The District Court concluded the plaintiffs showed likely violations of these state laws because none was enrolled within five days and one—Alembe Dunia—was "still not enrolled" when the injunction issued. *Issa*, 2016 WL 4493202, at *5.

While the School District's enrollment delays are indeed troubling, we must conclude the District Court erred

39

as a matter of law in finding that the plaintiffs showed a likelihood of success on their state law claims. Unlike the EEOA, which explicitly grants "individual[s]" the right to "institute a civil action" in court for equitable relief, 20 U.S.C. §§ 1706, 1713, our *de novo* review reveals nothing in 24 Pa. Stat. § 13-1301 or elsewhere in the Public School Code that *expressly* grants individuals, like students or their parents, a private cause of action to enforce the statute in court through equitable remedies.[11] *See* 24 Pa. Stat. §§ 1-101 to 27-2702. Likewise, 22 Pa. Code § 11.11(b), a regulation promulgated by Pennsylvania's State Board of Education, doesn't *expressly* grant private litigants a cause of action to

---

[11] In its entirety, 24 Pa. Stat. § 13-1301 states that

[e]very child, being a resident of any school district, between the ages of six (6) and twenty-one (21) years, may attend the public schools in his district, subject to the provisions of this act. Notwithstanding any other provision of law to the contrary, a child who attains the age of twenty-one (21) years during the school term and who has not graduated from high school may continue to attend the public schools in his district free of charge until the end of the school term. The board of school directors of any school district may admit to the schools of the district, with or without the payment of tuition, any non-resident child temporarily residing in the district, and may require the attendance of such non-resident child in the same manner and on the same conditions as it requires the attendance of a resident child.

remedy enrollment delays or denials in court through equitable relief, assuming a regulation can ever do so under Pennsylvania law.[12]

In the absence of an express private cause of action under a Pennsylvania statute, we look to whether the statute "*implicitly*" creates one. *Estate of Witthoeft v. Kiskaddon*, 733 A.2d 623, 626 (Pa. 1999) (emphasis added). When there's sufficient indicia of the General Assembly's intent, Pennsylvania courts have recognized the possibility of *implied* private causes of action and remedies stemming from state statutes that don't expressly provide for them. *See, e.g.*, *Schappell v. Motorists Mut. Ins. Co.*, 934 A.2d 1184, 1188–90 (Pa. 2007) (inferring a private cause of action from Pennsylvania's Motor Vehicle Financial Responsibility Law); *Estate of Witthoeft*, 733 A.2d at 625–28 (declining to infer a private cause of action from Pennsylvania's Motor Vehicle

---

[12] In its entirety, 22 Pa. Code § 11.11(b) states that

> [a] school district or charter school shall normally enroll a child the next business day, but no later than 5 business days of application. The school district or charter school has no obligation to enroll a child until the parent, guardian or other person having control or charge of the student making the application has supplied proof of the child's age, residence, and immunizations as required by law. School districts and charter schools receiving requests for educational records from another school district or charter school shall forward the records within 10 business days of receipt of the request.

Code and regulations); *Solomon v. U.S. Healthcare Sys. of Pa., Inc.*, 797 A.2d 346, 352–53 (Pa. Super. Ct. 2002) (finding no implied private cause of action under Pennsylvania's Health Care Act). Here, to the extent Pennsylvania decisions can be read to support an implied private cause of action, they suggest that exhaustion of administrative remedies may be required in the first instance. *See Velazquez ex rel. Speaks-Velazquez v. E. Stroudsburg Area Sch. Dist.*, 949 A.2d 354, 360 (Pa. Commw. Ct. 2008). But neither the District Court nor the parties cited any authority concerning the viability of an administrative exhaustion requirement or an implied private cause of action for equitable relief stemming from the Pennsylvania statute and regulations in issue. The District Court thus implicitly assumed such a private cause of action and remedy may be so inferred without exhaustion of administrative remedies.

Without any briefing on these issues—which appear to be matters of first impression under Pennsylvania law—we decline to resolve them. We'll leave them for the District Court to address in the first instance on remand, assuming they're raised by the parties. *See Young v. Martin*, 801 F.3d 172, 182 (3d Cir. 2015) (leaving legal questions not reached in the district court and not briefed on appeal "for the District Court to address in the first instance on remand"). Suffice it to say that, without any analysis of whether the plaintiffs can bring private causes of action for equitable relief without exhausting administrative remedies under these state laws, the District Court erred as a matter of law in concluding that the plaintiffs are likely to prevail on their state law claims.

We note, however, that nothing about the District Court's preliminary-injunction order relies specifically on a conclusion that the plaintiffs proved likely violations of

Pennsylvania law. Thus, we need not vacate any part of it on that ground. And even without proving likely violations of state law, the plaintiffs' successful showings under the EEOA may support a preliminary injunction. *See* 20 U.S.C. §§ 1712, 1713 (contemplating equitable relief for EEOA violations). We therefore proceed to the next element they must prove to justify one—irreparable harm.

**B**

A plaintiff seeking a preliminary injunction must prove irreparable harm is "likely" in the absence of relief. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008); *see Ferring Pharm.*, 765 F.3d at 213–14, 217.

We agree with the District Court that without preliminary relief, irreparable harm was likely for these plaintiffs, who would have remained in Phoenix's accelerated, non-sheltered program for at least the duration of this litigation. The plaintiffs already demonstrated a reasonable probability that Phoenix's programs are unsound for them and fail to actually overcome their language barriers under the EEOA. And these plaintiffs, all SLIFE, must overcome uniquely difficult challenges to learning. Time is of the essence: Their eligibility to attend public school in Pennsylvania is dwindling. We recognize that a sound educational program has power to "change the trajectory of a child's life," *G.L. v. Ligonier Valley School District Authority*, 802 F.3d 601, 625 (3d Cir. 2015), while even a "few months" in an unsound program can make a "world of difference in harm" to a child's educational development, *Nieves-Marquez v. Puerto Rico*, 353 F.3d 108, 121–22 (1st Cir. 2003) (internal quotation marks omitted); *cf. Plyler v. Doe*, 457 U.S. 202, 221 (1982) (noting the "lasting impact of [education's] deprivation on the life of the child"). In

accordance with this injunction, moreover, four named plaintiffs now attend McCaskey, where they say they're "flourishing." Appellees' Br. 45 n.11. Jockeying them back to Phoenix now would thus cause them greater harm, as the School District conceded during oral argument. Given these factors, we are satisfied the plaintiffs showed a likelihood of irreparable harm absent this injunction.

## C

We must now balance the parties' relative harms; that is, the potential injury to the plaintiffs without this injunction versus the potential injury to the defendant with it in place. *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*, 290 F.3d 578, 596 (3d Cir. 2002).

We already identified the irreparable harm the plaintiffs would likely suffer absent this injunction. And we agree with the District Court that the School District has "no interest in continuing practices" that violate § 1703(f) of the EEOA. *Issa*, 2016 WL 4493202, at *8. The School District argues the plaintiffs fail on this element because the injunction "permits usurpation" of its "decisionmaking authority" to place "older, non-credited students where they can best be educated," which could lead to "future litigation" in other unspecified "areas of . . . discretion" and to the "erosion" of unspecified "authority and funds." Appellant's Br. 54. The record before us, however, belies the School District's contention that Phoenix is where the plaintiffs "can best be educated." Under the EEOA, we reject an educational agency's call for unfettered decision-making authority when its programs fall short of § 1703(f)'s mandate. *See Gomez*, 811 F.2d at 1041 ("[W]e cannot accord such sweeping deference to state and local agencies that judicial review becomes in practice judicial abdication."). By the School

44

District's own representations, we know only eight students transferred from Phoenix to McCaskey after the preliminary injunction issued: four named plaintiffs and four similarly situated students. The School District therefore retains substantial "decisionmaking authority" over the affairs of the vast majority of its students, this injunction notwithstanding. We agree with the District Court that the balance of harms favors the plaintiffs.

## D

Finally, we must weigh whether the public interest favors this preliminary injunction. Doing so is "often fairly routine." *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 730 (3d Cir. 2004). If a plaintiff proves "both" a likelihood of success on the merits and irreparable injury, it "almost always will be the case" that the public interest favors preliminary relief. *Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 n.8 (3d Cir. 1994). The District Court found that it's "undeniably in the public interest for providers of public education to comply with the requirements" of the EEOA. *Issa*, 2016 WL 4493202, at *8 (internal quotation marks omitted). We agree. Preliminary relief is in the public interest here.

\* \* \*

Because the plaintiffs showed they're likely to succeed on the merits of their EEOA claims, they're likely to suffer irreparable harm without relief, the balance of harms favors them, and relief is in the public interest, we hold the District

45

Court did not abuse its discretion in granting their preliminary-injunction motion.[13]

**IV**

For the reasons explained above, we will affirm the District Court's preliminary-injunction order and remand for further proceedings consistent with this opinion.

---

[13] Though we will affirm this preliminary-injunction order, we recognize that significant administrative and budgetary implications may arise when a federal court orders the transfer of students across a school district. We note the School District wasn't given the opportunity to propose its own remedy before the injunction issued. While the timing of the injunction right before the start of the school year may have made alternative relief impracticable at that time, the District Court should allow the School District an opportunity to propose a legally compliant solution, among other alternatives considered by the Court, before the issuance of any permanent injunction, if the plaintiffs ultimately succeed on the merits of their EEOA claims. *See Horne*, 557 U.S. at 454 (stating that the EEOA, "while requiring a State to take 'appropriate action to overcome language barriers,'" leaves state and local educational authorities a "'substantial amount of latitude in choosing' how this obligation is met" (quoting *Castaneda*, 648 F.2d at 1009)).